# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-DR-02503-SCT

*MICHELLE BYROM*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 11/18/2000 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| COURT FROM WHICH APPEALED: | TISHOMINGO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | LOUWLYNN VANZETTA WILLIAMS |
| | ROBERT M. RYAN |
| | WILLIAM J. CLAYTON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | JOHN R. YOUNG |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | PETITION FOR POST-CONVICTION RELIEF DENIED - 01/19/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Michelle Byrom was convicted by a Tishomingo County jury of capital murder in the shooting death of her husband, Edward Byrom, Sr.  After the jury verdict, Byrom waived her right to a sentencing hearing before the same jury and instead, chose to allow the trial judge to conduct the sentencing hearing without a jury.  At the conclusion of the sentencing phase,

the trial judge sentenced Byrom to death. On direct appeal, this Court affirmed Byrom's conviction and sentence. *Byrom v. State*, 863 So.2d 836 (Miss. 2003). Rehearing was denied, and the United States Supreme Court denied certiorari. *Byrom v. Mississippi*, 125 S.Ct. 71, 160 L.Ed.2d 40, 73 USLW 3207 (2004).

¶2.     Byrom now seeks relief pursuant to Miss. Code Ann. Sections 99-39-1 et seq. (Rev. 2000) by way of her Petition for Post-Conviction Relief and Supplement to Petition for Post-Conviction Relief. We have considered Byrom's petition and supplement, and after a full review of the claims raised by Byrom in her pleadings, we find Byrom's petition for post-conviction relief is without merit and should be denied.

### FACTUAL AND PROCEDURAL BACKGROUND

¶3.     After Byrom's conviction of capital murder and imposition of the death penalty, Byrom appealed to this Court. On her direct appeal, we considered the following issues: (1) requiring two defense doctors to turn over their psychiatric reports of Byrom to the prosecution; (2) denial of a request for change of venue; (3) requiring Byrom to submit to a psychiatric examination by Dr. Cris Lott, who also examined her son and another co-defendant; (4) requiring Byrom to turn over her medical records to Dr. Lott; (5) refusal to permit the introduction by the defense of certain pornographic videotapes; (6) failure to grant Byrom's amended motion to suppress and compel discovery; (7) refusal to reopen a suppression hearing; (8) refusal to quash the indictment; (9) prohibition of impeachment of Edward Byrom, Jr.; (10) failure to grant a mistrial after the admission of testimony that Joey

2

Gillis was charged with the capital murder of Edward Byrom, Sr., and the prosecution's closing argument to the same effect; (11) refusal of the defendant's requested jury instruction concerning accessory after the fact; (12) limiting the cross-examination of Eric Byrom (the victim's nephew); (13) admission of evidence concerning drug dog's search; (14) refusing to charge the jury that it had to find Byrom offered something of value to Joey Gillis before it could convict her of capital murder; and, (15) erroneous imposition of the death sentence, which was disproportionate. *See* **Byrom v. State**, 863 So.2d 836 (Miss. 2003). The following statement of facts is taken from this Court's opinion:

> In late May and early June 1999, [Michelle] Byrom began looking for someone to kill her husband. After attempting to hire at least one other person, Byrom contracted with Joey Gillis (Gillis) to kill Byrom, Sr. Byrom and Gillis negotiated a price of $15,000, which was to be paid from the victim's life insurance proceeds. The Byroms' son, Edward Byrom, Jr. (Junior), who assisted his mother in finding a killer, was aware that Gillis had been hired to kill his father. Gillis attempted to kill Byrom, Sr. on two separate occasions prior to the murder. Both attempts went unnoticed by Byrom, Sr. Byrom suffers from Munchausen Syndrome [FN1] and had been intentionally ingesting rat poison for at least three years prior to the death of her husband. On the morning of June 4, 1999, Byrom visited her physician, Dr. Ben Kitchens, who informed her that she had pneumonia and needed to go to the hospital.[FN2] Byrom, Sr. took off work and drove Byrom to the hospital. He stayed at the hospital with Byrom for awhile, then left, promising to return after lunch. Byrom, Sr. went home, told Junior what room his mother was in, and then went into his private room to watch television. A few hours later, Byrom, Sr. was shot to death with his World War II relic Luger 9-millimeter pistol. There was no allegation or evidence of forced entry.
>
> [FN1.] People suffering from this disorder intentionally injure themselves in an attempt to garner sympathy. However, persons suffering from this disorder are different from malingerers in that Munchausen sufferers will be aware of their deceits but unaware of their motivations.

3

[FN2.] Byrom also suffers from numerous other ailments, including: lupus, pneumonia, hip replacement, and severe depression. Several of her health problems are a direct result of her ingestion of rat poison.

According to Junior's and Gillis's statements, sometime after Byrom, Sr. informed Junior about his mother, Junior, accompanied by Gillis, left his house. Junior dropped Gillis off near a wooded area that led to a field beyond the Byrom home. Gillis was wearing a glove on his right hand and carrying the 9-millimeter pistol. Thirty minutes later, Junior picked Gillis up at the same location. Junior asked Gillis if his father had been killed, and Gillis said yes. When Junior asked if Gillis was the one who killed his father, Gillis indicated that he did not do it. [FN3] Junior and Gillis disposed of the glove and shirt that Gillis was wearing and hid the pistol. Junior took Gillis home, then traveled to the hospital and told Byrom that "it was done." Byrom told Junior to return home to make sure Byrom, Sr. was dead and to get him help if he was suffering. Junior went home and found his father dead. He then called 911 to report the murder.

[FN3.] Gillis claimed throughout that he was not the shooter; however, no physical evidence was ever discovered to indicate that anyone else was involved.

Upon arriving at the Byrom home, the Tishomingo County Sheriff Department personnel became suspicious of Junior. He had cuts on his knuckles, which he claimed to have received after he struck an interior door in anguish upon discovering Byrom, Sr.'s body. He also had blood on the back of his pants near his belt line and on the leg. [FN4] Junior was taken into custody to await questioning. He later confessed, implicating himself, Byrom, and Gillis in the murder.

[FN4.] The blood was later determined to be his own from the injury to his knuckles sustained when he punched an interior door after discovering his father's body.

Through Junior's confession, law enforcement determined that Gillis had been in the company of Junior that day at the Byrom home. Gillis was located and taken into custody for questioning. He later confessed to his involvement in the murder as well as that of Byrom and Junior. However, he maintained that someone else had actually killed Byrom, Sr.

4

Rick Marlar, an investigator with the Criminal Investigation Bureau (CIB) of the Mississippi Highway Patrol (MHP), went to the hospital and conducted the first of five interviews with Byrom. She did not incriminate herself during this interview. Later that same night, Tishomingo County Sheriff David Smith went to the hospital and interviewed Byrom a second time. After being informed that Junior had "told everything," Byrom confessed, implicating herself, Junior, and Gillis in the murder. This and a subsequent statement were suppressed because of defective *Miranda* warnings. However, Byrom later gave two additional statements during which she revealed substantially the same incriminating information.

As part of a plea agreement, Junior pled guilty to conspiracy to commit capital murder, accessory before the fact to grand larceny, and accessory before the fact to burglary with intent to commit assault. He also testified against his mother. Gillis, the alleged "trigger-man" whom Byrom purportedly promised to pay for the murder of her husband, pled guilty to accessory after the fact to capital murder and conspiracy to commit capital murder.

*Byrom*, 863 So.2d at 845-46. Byrom's petition for writ of certiorari was denied by the United States Supreme Court on October 4, 2004.

¶4. Byrom has now filed her Petition for Post-Conviction Relief and Supplement to Petition for Post-Conviction Relief with this Court; the State has filed its Response; and Byrom has filed her Rebuttal.

¶5. Byrom raises the following issues in her Petition for Post-Conviction Relief: (1) ineffective assistance of trial counsel; (2) denial of her federal and state constitutional rights at the sentencing phase; (3) a fatally defective indictment that did not provide adequate notice of the specific offenses against her; (4) denial of a fundamentally fair trial due to exclusion of relevant evidence; (5) the death sentence was disproportionate; (6) newly discovered

5

evidence which would exonerate her; and, (7) the cumulative effect of trial errors denied her federal and state constitutional rights.

## DISCUSSION

**I.**   **WHETHER BYROM WAS DENIED HER SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT BOTH THE GUILT AND SENTENCING PHASES OF THE TRIAL WITHIN THE MEANING OF *STRICKLAND v. WASHINGTON* AND THE CORRESPONDING PORTIONS OF THE MISSISSIPPI CONSTITUTION.**

¶6.    Michelle Byrom first argues she was denied effective assistance of counsel. We have previously addressed the issue of ineffective assistance of counsel and the standard provided in *Strickland v. Washington*, 466 U.S. 668 (1984):

> "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A defendant must demonstrate that his counsel's performance was deficient *and* that the deficiency prejudiced the defense of the case. *Id.* at 687, 104 S.Ct. 2052. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State,* 454 So.2d 468, 477 (Miss. 1984) (citing *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. 2052). The focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances. *Id.*
>
> Judicial scrutiny of counsel's performance must be highly deferential. (citation omitted) ... [A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

6

assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Stringer,* 454 So.2d at 477 (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Defense counsel is presumed competent. *Id.*

Then, to determine the second prong of prejudice to the defense, the standard is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr v. State,* 584 So.2d 426, 430 (Miss. 1991). This means a "probability sufficient to undermine the confidence in the outcome." *Id.* The question here is:

whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death. *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068.

There is no constitutional right then to errorless counsel. *Cabello v. State,* 524 So.2d 313, 315 (Miss. 1988); *Mohr v. State,* 584 So.2d 426, 430 (Miss. 1991) (right to effective counsel does not entitle defendant to have an attorney who makes no mistakes at trial; defendant just has right to have competent counsel). If the post-conviction application fails on either of the *Strickland* prongs, the proceedings end. *Neal v. State,* 525 So.2d 1279, 1281 (Miss. 1987); *Mohr v. State,* 584 So.2d 426 (Miss. 1991).

*Davis v. State,* 743 So.2d 326, 334 (Miss. 1999) (citing *Foster v. State,* 687 So.2d 1124, 1130 (Miss. 1996)).

*Brown v. State,* 798 So.2d 481, 493-94 (Miss. 2001). Byrom's ineffective assistance of counsel argument includes four sub-parts.

**A.** **Trial counsel's failure to actively pursue a change of venue denied Michelle Byrom effective assistance of counsel.**

¶7. Byrom alleges her counsel "exercised unreasonable judgment in not actively pursuing a change of venue and/or order denying the same." This Court considered the issue of failure to grant the motion for change of venue on direct appeal. We could find no motion for change of venue in the record, and there was no indication that such a motion had been presented to the trial judge or ruled on. However, we still considered this issue on its merits.

> There is no evidence in the record, nor demonstrated by Byrom in her brief, that the failure to move her trial to another county was prejudicial to her case. A motion for a change of venue is not automatically granted in a capital case. There must be a satisfactory showing that a defendant cannot receive a fair and impartial trial in the county where the offense is charged. Miss. Code Ann. § 99-15-35 (Rev. 2000). *See also* **Gray v. State**, 728 So.2d 36, 65 (Miss. 1998). Moreover, the trial judge took steps, suggested and condoned by Byrom's counsel, to preserve the jury's impartiality.

**Byrom**, 863 So.2d at 851.

¶8. Thus, while we find the change-of-venue issue to be procedurally barred, we discuss it further here only from the standpoint of Byrom's claim that her trial counsel's failure to pursue a change of venue resulted in Byrom receiving trial representation which was legally ineffective.

¶9. Byrom begins with a discussion of ineffective assistance of counsel decisions from the United State Supreme Court. She then starts a new section entitled "Ineffective Assistance of Petitioner's Counsel After **Wiggins v. Smith**," referring to **Wiggins v. Smith**,

8

539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Byrom provides little discussion on how *Wiggins* is relevant to her claim based on a change of venue.

¶10. Byrom cites numerous decisions from this Court and other jurisdictions on the applicable standards for change of venue in criminal cases involving potentially prejudicial publicity, including *Fisher v. State*, 481 So.2d 203 (Miss. 1985); and, *Johnson v. State*, 476 So.2d 1195 (Miss. 1985); *see also* **Grayson v. State**, 806 So.2d 241 (Miss. 2001) (affirming denial of change of venue in capital case). Byrom argues that pervasive and prejudicial publicity existed in her case. She attaches newspaper articles from the local press at the time of her trial. She also points to voir dire, where over forty individuals stated they were aware of the case through the media or other sources. Other members of the venire had already formed opinions about the case, and also some venire members had family members who were potential witnesses. Byrom finally asserts that the "court's limited voir dire in open court was insufficient to establish the effect of pre-trial publicity."

¶11. The State argued Byrom's jury was selected on November 13, 2000. Included in the articles attached by Byrom were from the *Northeast Mississippi Daily Journal* dated November 14, 2000, the *Daily Corinthian* dated November 15, 2000, the *Tishomingo County News* dated November 16, 2000, the *Daily Corinthian* dated November 16, 2000, and the *Daily Corinthian* dated November 17, 2000. The State argues that because these articles were published after the jury was selected and sequestered, they cannot serve as a basis for the argument that the jury was prejudiced by publicity.

9

¶12.   The State next discussed two undated articles from the *Tishomingo County News*. The State claims that the first article must have been published in August 1999, as it dealt with Joey Gillis's preliminary hearing, which took place on August 2, 1999. The State claims the second article was published in June 1999, shortly after Edward Byrom, Sr.'s murder on June 4, 1999. The State argues that these articles do not amount to the kind of publicity which would have warranted a change in venue, even if they had been presented to the trial judge.

¶13.   The State also addresses Byrom's allegation that "[a]t least two individuals who responded that they had pretrial knowledge of the case were actually seated on the jury." The record references cited by Byrom point to Shelia Cooley and Donna Durham as the jurors in question. A review of the record reveals that during voir dire, both Cooley and Durham stated that they did not know what happened in the case; both stated that they would not be influenced by what they had heard; and, both stated they would rely only on the trial evidence in making their decisions.

¶14.   The State answers Byrom's allegation that "Connie Lorella Dexter knew Byrom but did not respond when asked by the court." The State points to voir dire where the trial court specifically calls on Ms. Dexter, and she answers that "[o]ur children played baseball in the same baseball summer league." Her connection to Byrom was "just seeing them on the baseball field." Dexter denied this would cause her any problem serving as a juror in this case.

¶15. After a thorough review of the record, we find no justifiable reason necessitating a change of venue in this case. Stated differently, as we found on direct appeal, the trial court certainly committed no error in failing to change venue in this case. Therefore, trial counsel's failure to aggressively seek a change of venue could hardly be deemed to rise to the level of rendering ineffective assistance. Thus, it follows that Byrom's claim of ineffective assistance of counsel for failure to pursue a change of venue is without merit.

**B.** **Failure of Byrom's trial counsel to conduct an adequate investigation generally.**

¶16. Byrom next makes a general argument of law, citing ***Wiggins v. Smith***, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), as the "most recent definitive pronouncement from the United States Supreme Court concerning ineffective assistance of counsel claims." The United States Supreme Court found Wiggins received ineffective assistance of counsel where his trial counsel had failed to investigate and present mitigating evidence of Wiggins's background, including physical and sexual abuse committed by his mother, by a series of foster parents, and by a Job Corps supervisor, as well as evidence of mental retardation. 539 U.S. at 516-18, 123 S.Ct. at 2533. Counsel for Wiggins failed to make this investigation even though the State made funds available for this purpose. 539 U.S. at 524, 123 S. Ct. at 2536. Trial counsel instead attempted to show that Wiggins was not responsible for the murder in question. 539 U.S. at 519, 123 S.Ct. at 2534. The Supreme Court stated:

> In finding that Schlaich and Nethercott's investigation did not meet ***Strickland***'s performance standards, we emphasize that ***Strickland*** does not require counsel to investigate every conceivable line of mitigating evidence no

11

matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the "constitutionally protected independence of counsel" at the heart of *Strickland*, 466 U.S., at 689, 104 S.Ct. 2052. We base our conclusion on the much more limited principle that "strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation." *Id.,* at 690-691, 104 S.Ct. 2052. A decision not to investigate thus "must be directly assessed for reasonableness in all the circumstances." *Id.,* at 691, 104 S.Ct. 2052.

*Wiggins*, 539 U.S. at 533. Under *Wiggins*, counsel may make strategic decisions to introduce, pursue or ignore certain evidence, but these decisions may amount to ineffective assistance if made based on an inadequate or unreasonable investigation.

¶17. Byrom further argues that the key element in *Wiggins* is the Supreme Court's use of the phrase "prevailing professional standards." After appearing to argue that *Wiggins* set a new standard in ineffective assistance cases, Byrom states that the United States Supreme Court "specifically made it clear that *Wiggins* does not create new law but simply re-adopts and clarifies the import of *Strickland*." Byrom then cites numerous cases from other states and the federal courts where counsel was found to be ineffective. Of particular import, however, is that Byrom did not raise ineffective assistance of counsel on direct appeal. Likewise, in her PCR petition Byrom did not raise ineffective assistance of counsel on direct appeal. Likewise, in her PCR petition before us today, Byrom asserts no specific ground of her trial counsel's ineffective assistance, but instead makes the general assertion that *Wiggins* somehow changes the procedure for appellate review of ineffective assistance of counsel claims pursuant to *Strickland*. We disagree and thus find this issue to be without merit.

12

### C. Failure of Byrom's counsel to conduct an adequate investigation in the guilt-innocence and sentencing phases.

¶18.    Byrom specifically argues that trial counsel failed to conduct any investigation of her background, such as her medical, educational, employment and training, family histories, and religious and cultural influences. Byrom complains that counsel did not call a single witness, including Byrom, herself, during the guilt phase. She states that she and Kenneth Dimitro could have rebutted any notion of a good relationship between Edward Byrom, Jr. and the deceased.

¶19.    The State answers first that the issue as to Edward Byrom Jr.'s testimony should be barred, because Byrom failed to specifically state where in the appeal record Edward, Jr. ever testified that his relationship with his father was good. The State then cites Junior's testimony, where he recounts arguments with his father consisting of punches, threats to use guns and baseball bats, shouting, cursing, and alcohol abuse, with Junior primarily the recipient of this abuse. The State argues that because there was no testimony that Junior led a normal home life, Byrom's trial counsel was not ineffective for failure to rebut such a notion.

¶20.    Byrom next argues trial counsel did not present a single witness in the sentencing phase. The defense instead submitted reports from Dr. Ben Kitchens and Dr. Keith Caruso. According to the reports, Dr. Kitchens saw Byrom in 1997, 1998 and 1999. Michelle no

doubt had several medical/physical problems such as lupus, depression, high blood pressure and alcohol abuse.

¶21. Dr. Caruso, a psychiatrist, reported that at the time of the death of Michelle's husband, Michelle suffered from major depression, alcohol dependence, Munchausen's Syndrome, physical abuse, borderline personality disorder, lupus, pneumonia, anemia, chronic pain and hypertension, among other problems. As we noted on Byrom's direct appeal, people who suffer from Munchausen's Syndrome "intentionally injure themselves in an attempt to garner sympathy. However, persons suffering from this disorder are different from malingerers in thath Munchausen sufferers will be aware of their deceits but unaware of their motivations." *Byrom*, 863 So.2d at 845, n. 1. Byrom was using nine different medications at the time of her husband's murder. Dr. Caruso's report provided a "relevant personal history" which contained reports of physical and sexual abuse by her alcoholic stepfather during her teen years, including that she was used by him as a prostitute; that she ran away from home at fifteen and worked as a stripper before meeting the victim and marrying him; that Edward Sr. became increasingly physically abusive, particularly when drinking; that he was unfaithful to her on numerous occasions; that he physically and psychologically abused their son; and, that she became increasingly dependent on alcohol and purposely injured herself so she could be admitted to a hospital to escape the abuse for a short time. Dr. Caruso stated that a combination of her physical and psychological problems, along with the number of

14

drugs she was taking and her alcohol abuse, led to a feeling of helplessness which resulted in her believing that violence was a solution to her problems.

¶22. Byrom claims several family members were available to testify, but were not called; and, that her trial counsel never discussed the case with them, or that they were not "allowed" to attend the trial. Byrom specifically cites the affidavits of her brother, Kenneth Dimitro; her mother, Betty Polstalwait; her sister-in-law, Doranna Dimitro; her brother, Louis Dimitro; her niece, Leighanne Bundy; her sister, Helen Marie Garnett; and her own affidavit. We provide here a summary of these affidavits.

¶23. Kenneth Dimitro, stated he was never contacted by Byrom's attorneys; that Edward Sr. was a drunk; that Byrom's nature was that she would not complain to her family about her personal life; that Byrom would never commit suicide because she had too much to live for; that Byrom came from a big family, and all the siblings stuck together; that their stepfather was an abusive drunk who sexually abused Byrom, so she ran away from home as a teenager; and, that he (Kenneth) would have testified for Byrom.

¶24. Betty Polstalwait stated no one contacted her about Byrom's case and she thus did not attend Byrom's trial; that Byrom was a good child; that Michelle had a normal childhood, except for leaving when she was a teenager; and, that Byrom had a drinking problem but she was not a mean person.

¶25. Doranna Dimitro stated she was not contacted by Byrom's attorneys prior to or during the trial; that Byrom would try to hide the fact that she was abused by the victim because she

15

was humiliated; that Byrom would drink and take drugs to escape from reality; that Junior and Byrom were protective of each other; that Sunny Phillips, one of Byrom's attorneys, said she did not want to try the case but was forced to; that none of Byrom's lawyers ever told them anything about the case; that they tried to get transcripts of the trial but had thus far been unable to do so; and that she was not allowed to attend trial or read a newspaper, but instead, she stayed at the hotel.

¶26.    Louis Dimitro stated that Byrom was a good and helpful person; that she hid her husband's abuse of her from her family, and thus became secluded; that she drank to escape reality; that he (Louis) found out about Byrom's arrest from the chaplain at the jail; that Byrom's attorney contacted him twice by phone, but never interviewed him or asked him about Byrom's life; that Edith, the victim's mother, never blamed Byrom for her son's death; that he and his siblings had "an average" home life except for their stepfather, who physically abused all of the children, and sexually abused Byrom, causing her to leave home at age fifteen; that one of Byrom's attorneys told certain family members to attend the trial, but once they arrived at the courthouse, they were not allowed to attend the trial; that Byrom was schizophrenic and bi-polar, in addition to having lupus; that Byrom's marriage with Edward, Sr. was very abusive; and, that Edward, Sr. once got Louis's girlfriend "real drunk and took advantage of her."

¶27.    Leighanne Bundy stated she lived with Byrom and the victim for about one and one-half years; that Byrom was like a second mother to her; that she (Leighanne) witnessed

16

Byrom's bad marriage and the abuse of Byrom and Edward, Jr. at the hands of Edward, Sr.; that Edward, Sr. had violent mood swings, particularly when he was drinking; and, that she (Leighanne) was a host, along with Edward, Jr., at some of the parties at the house where Byrom and Edward, Sr. would go to a local motel.

¶28.   Helen Marie Garnett stated she did not care for Edward Byrom Sr. because he sexually assaulted her, but she never told Byrom; that Byrom and Edward, Sr. had a "decent" relationship; that Edward, Sr. and Edward, Jr. had a bad relationship; that Byrom was a really good person; that Edward, Jr. was a "good boy" and he and her daughter, Leighanne, were "very close;" and, that had anyone asked her, she would have testified, but Byrom's lawyers never talked to her.

¶29.   In her affidavit, Byrom stated her marriage to the victim was terrible because he was violent and jealous and physically abusive toward her and Edward, Jr.; that she began drinking to deal with the abuse; that she left home when she was a teenager to escape an abusive stepfather; that she remembered talking to her attorneys "2-3 times" before the trial, and she probably spent "1-2 hours" with her attorneys discussing her case; that her attorneys decided not put on any witnesses, saying Leighanne Bundy was too young and Helen Marie Garnett's brain problem was too extensive; that one of her attorneys, Terry Wood, told her that if the judge sentenced her then she would go to jail for "6 months to 2 years;" that her attorneys did not explain that she was eligible for the death penalty, and she didn't realize that she could get the death penalty until the sentencing phase; that the judge kept making

17

comments to the jury that she deserved the death penalty; and, that she wanted to testify but one of her attorneys, Terry Wood, told her she would not make a good witness.

¶30.    Byrom also attached several dozen pages of medical records from her treatment in 1998 at Helen Keller Hospital in Sheffield, Alabama.   The records reveal that Byrom evidently suffered from lupus at the time.

¶31.    In its Response, the State attached the affidavits of Terry L. Wood and Sonya (Sunny) Phillips, Byrom's trial counsel.  Both affidavits contain the following language:

> I fully discussed the matter of the waiver of the jury during the sentence phase of the trial with Michelle Byrom.  While I did suggest this trial strategy to Ms. Byrom, the ultimate decision was hers.  Although she stated that she fully understood ramifications of the decision to waive the jury for sentencing, I cannot be certain she did so.  The trial court further explained the ramifications of waiving the jury to Michelle Byrom in open court and she stated that she understood the rights she was waiving.

¶32.    Both affidavits discuss interviewing potential witnesses, some of whom were Byrom's family members.  Terry Wood states that he had lengthy discussions with Byrom's family members regarding the case, but that he could not remember their names.  He also stated that he arranged for these out-of-state family members to be present in Iuka during the trial.

¶33.    Sonya Phillips stated that she specifically spoke with the following family members: Renee Copeland, (who did not submit an affidavit), Louis Dimitro, and Leighanne Garnett (Bundy). Phillips also stated that she arranged for these family members, along with Helen Garnett, to be present in Iuka at the time of the trial so that they could be called as witnesses if they were needed.   The affidavits of Wood and Phillips each contain the following

18

language: "Because of events during the trial of this case I decided, as a matter of trial strategy, not to call these witnesses before the court during the sentencing phase of the trial."

¶34. The State argues first that the affidavits of Kenneth Dimitro, Betty Polstalwait, Doranna Dimitro, Louis Dimitro, Leighanne Bundy, and Helen Marie Garnett, are procedurally faulty, as the affidavits were apparently signed by the affiants in Tennessee or Michigan, but notarized by a Rankin County, Mississippi, notary public, who would have no authority to administer an oath outside the state of Mississippi. Indeed, a review of these affidavits reveals the affidavits of Kenneth Dimitro, Betty Polstalwait, Doranna Dimitro, and Louis Dimitro begin with the phrase "State of Tennessee, County of Rutherford," and the affidavits of Leighanne Bundy and Helen Marie Garnett begin with the phrase "State of Michigan, County of Monroe." However, all six of the affidavits are notarized by a Rankin County, Mississippi notary public.

¶35. The State further argues the affidavits contain much hearsay, speculation, irrelevant and contradictory statements. The State opines that some statements in the affidavits are not credible. The State further points out that several of the affiants admit to having been in Iuka during the trial, and were obviously kept away from the trial by defense counsel so they could be called as witnesses, if necessary. The State argues it is obvious why some of these affiants were not called as witnesses, such as Helen Garnett's unexplained "brain problem" or Leighanne Bundy's attendance at certain parties at the Byrom house while Byrom and Edward Sr. were away.

19

¶36. The failure of defense counsel to call any witnesses, particularly at sentencing, is admittedly perplexing. The generic statements in the defense attorneys' affidavits that they did not call the family witnesses because of trial strategy is not helpful. The affidavits of the family members reveal at least clues as to why some may not have been called. The trial judge was provided with doctors' reports at the sentencing phase of the trial, and these reports set out Byrom's life and physical and mental condition in sad detail. The gist of the family members' testimony from the affidavits was that Byrom was a good person who had lived a difficult life and that whatever she did was because she was sick and in a terrible situation. However, to argue that this testimony, which was already known to the trial judge, would have been any more convincing or persuasive if presented through witness testimony, is, at best, speculative. Thus, from the record before us, when we necessarily apply the *Strickland* criteria, we are unable to conclude that trial counsel's investigation was unreasonable or ineffective, or that their failure to call the family members amounted to ineffective assistance of counsel. Therefore, we find Byrom's argument that her trial counsel failed to conduct an adequate investigation for the guilt-innocence phase and the sentencing phase is without merit.

### D. Trial Counsel Failed to Object and Preserve for Appeal Improper Comments Made by the Prosecutor during the Closing Argument.

¶37. During closing argument at the guilt phase of the trial, the assistant district attorney stated: "[A]nd as Mr. Ralph Dance testified, Mr. Gillis is in jail awaiting trial. That was his

testimony." Defense counsel did not object. This issue was raised on direct appeal. This Court found the matter was procedurally barred because of the lack of objection. Notwithstanding the procedural bar, we still discussed the merits of the issue and stated:

> There was ample evidence presented at trial regarding Gillis's involvement in this crime, including Byrom's and Junior's statements, and the disputed comment by the prosecutor was nothing more than a comment on that evidence, which had been received without any objection from Byrom. Finally, Byrom has failed to assert, or even demonstrate, that she suffered any prejudice as a result of these comments.

*Byrom*, 863 So.2d at 873.

¶38. Notwithstanding the procedural bar, for the reasons stated, we find Byrom's argument that her defense counsel rendered ineffective assistance due to their failure to object to the prosecutor's comments during the State's closing argument of the guilt phase of the trial is without merit.

¶39. In sum, Byrom claims her trial counsel rendered ineffective assistance by (1) failing to actively pursue a change of venue; (2) failing to generally conduct an investigation of her case; (3) failing to conduct an adequate investigation in preparation for the guilt-innocence phase and the sentencing phase of her trial; and, (4) failing to object and preserve for appeal purposes the prosecutor's improper comments during the guilt phase of the trial. We have determined each of these arguments is without merit because, in her efforts to meet the *Strickland* criteria, Byrom has failed to demonstrate that her trial counsel's actions were deficient *and* that the deficiency prejudiced the defense of her case. *Strickland*, 466 U.S. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death

21

sentence resulted from a breakdown in the adversary process that renders the result unreliable." **Stringer v. State,** 454 So.2d 468, 477 (Miss. 1984) (citing **Strickland**, 466 U.S. at 687). We thus find Byrom's argument that she was denied her Sixth Amendment right to the effective assistance of counsel at her trial is without merit.

II. **WHETHER THE ERRORS AND OMISSIONS OF THE TRIAL JUDGE AT SENTENCING DENIED BYROM OF FUNDAMENTAL CONSTITUTIONAL RIGHTS AS GUARANTEED UNDER THE UNITED STATES AND MISSISSIPPI CONSTITUTIONS.**

¶40. Michelle Byrom next argues she was improperly sentenced by the trial judge to death, as Miss. Code Ann. Section 99-19-101 (Rev. 2000) provides for sentencing only by a jury in capital cases. Section 99-19-101(1) states:

> Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a jury to determine the issue of the imposition of the penalty. *If the trial jury has been waived, or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose or may be conducted before the trial judge sitting without a jury if both the State of Mississippi and the defendant agree thereto in writing.* In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitutions of the United States or of the State of Mississippi. The state and the defendant and/or his counsel shall be permitted to present arguments for or against the sentence of death.

22

(Emphasis added). In ***Bishop v. State***, 812 So.2d 934 (Miss. 2002), this Court found the statutory requirement of a jury for sentencing in capital cases could be waived, even though the defendant exercised the right to a jury trial during the guilt phase. The State, in addition to citing ***Bishop***, argues that Byrom did not raise this issue on direct appeal, and it is procedurally barred under Miss. Code Ann. Section 99-39-21(1). The State is correct. However, while Byrom is indeed procedurally barred from raising this issue in her PCR petition, procedural bar notwithstanding, we address the merits of this issue and state that our decision in ***Bishop*** clearly lays to rest the issue of whether a defendant being tried under our statutory sentencing scheme may waive a jury and defer to the trial judge as to the appropriate sentence upon a jury's finding of guilt as to capital murder. Clearly, a jury may be waived by a defendant upon a finding by the trial judge that the defendant's waiver is knowingly and intelligently made. Thus, Byrom's argument that the capital sentencing statute does not permit a waiver of a jury for sentencing purposes is without merit.

¶41.     Byrom next argues that even if a waiver were possible in this situation, her waiver of a sentencing jury was not "knowingly and intelligently made" and therefore was not valid. She argues that the trial judge failed to advise her of "the necessary proof and constitutional rights that would be affected prior to signing the waiver." Byrom argues she had a right to be informed of the constitutional rights she was waiving, the minimum and maximum sentences that could be given for the particular crime, and the elements of the charge against her, citing ***Spry v. State***, 796 So.2d 229 (Miss. 2001); ***Ward v. State***, 708 So.2d 11 (Miss.

23

1998); ***Washington v. State***, 620 So.2d 966 (Miss. 1993); and ***Horton v. State***, 584 So.2d 764 (Miss. 1991). Each of these cases involved a situation where the defendant entered a plea of guilty.

¶42. A review of the Petition for Sentencing Without a Jury, dated November 18, 2000, and signed by Byrom, her attorneys and trial judge, the Certificate of Counsel, and the colloquy between Byrom and the trial judge, unquestionably reveals that Byrom was informed she had the right to a sentencing hearing and that she could be sentenced to death, life without parole, or life imprisonment. She was informed that she had been convicted of capital murder by the jury; that the jury would have to unanimously find, beyond a reasonable doubt, the existence of any aggravating circumstances in order to sentence her to death, but that mitigating factors would not have to be found unanimously or beyond a reasonable doubt; and, that the jury would have to find that the mitigating circumstances did not outweigh the aggravating circumstances before the jury could impose the death penalty. The State had filed a Notice of Aggravating Circumstances on October 24, 2000.

¶43. Byrom was told the trial judge would perform the same analysis as a jury, but it would be solely within his discretion as to whether to impose the death sentence. Byrom was asked if she felt she had the benefit of a complete and adequate discussion with her attorneys concerning her waiver of a jury as to sentencing, and Byrom stated she had. Byrom's attorneys stated that they explained the maximum and minimum penalties for capital murder and considered her competent to understand the charges against her and the effect of her

24

petition to waive sentencing by a jury.[1]  Byrom's attorneys stated they felt she was mentally and physically competent and had no reason to believe Byrom was under the influence of any drugs which would affect her understanding of the proceedings.

¶44.    Byrom argues she was given erroneous information as to potential sentences.  She states she was told she could receive life imprisonment with the possibility of parole but it was actually not an option at the time of her sentencing.  Byrom cites no authority in support of this argument, and the State does not respond to it.  There is no question that Section 99-19-101 provides that "[u]pon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment."  Miss. Code Ann. § 99-19-101(1)(Rev. 2000).  Indeed, the petition signed by Byrom, her attorneys, and the trial judge states that Byrom understood she could be sentenced in the discretion of the trial judge "to the death penalty, to life without parole, or to life imprisonment."  The waiver signed by the prosecutor contained similar language as to the available sentencing options.  The certificate of counsel signed by Byrom's trial attorneys stated, inter alia, the had explained to Byrom "the maximum and minimum penalties" for capital murder.

---

[1]Both the affidavits of Wood and Phillips, Byrom's trial attorneys, state that although Byrom stated that she fully understood the ramifications of her decision to waive a jury for the sentencing phase of her trial, they "cannot be certain she did so." This is no more than a conclusory statement which does not create the need for a factual determination via an evidentiary hearing on Byrom's PCR petition.

25

¶45.   There can be no doubt that, pursuant to our capital sentencing statute, Section 99-19-101, Byrom was advised as to the sentencing options available to a jury, or a judge sitting without a jury, after a capital murder conviction.   However, our parole statutes have admittedly eliminated the practical effect of a life imprisonment sentence imposed under the provisions of Section 99-19-101, insofar as the possibility of parole.  *See* Miss. Code Ann. § 47-7-3(1)(f).

¶46.   In *Branch v. State*, 882 So.2d 36 (Miss. 2004), the defendant claimed the trial judge erred in not giving the jury the third sentencing option of life with the possibility of parole which, according to Branch, would have possibly caused the jury to take the middle ground of life without parole, instead of imposing the more harsh sentence of death, or the more lenient sentence of life with the possibility of parole.   In referring to Miss. Code Ann. Sections 97-3-21, 99-19-101(1), and 47-7-3(1)(f) and our decision in *Pham v. State*, 716 So.2d 1100, 1103 (Miss. 1998), we stated:

> We again revisited the sentencing options afforded a capital murder defendant in *Flowers v. State*, 842 So.2d 531 (Miss. 2003), and noted that § 47-7-3(1)(f) denies parole eligibility to any person "charged, tried, convicted, and sentenced to life imprisonment under the provisions of Section 99-19-101." *Flowers*, 842 So.2d at 540.

*Branch*, 882 So.2d at 79.

¶47.   Thus, while our capital sentencing statute still provides for life imprisonment, our parole statutes clearly do not.  We reaffirmed this fact in *Pham*, and later in *Flowers*.  The stark reality of all of this is that while Byrom's trial judge did, as a matter of clear statutory

26

law, have three sentencing options, including life imprisonment, the executive branch of state government via the Mississippi Department of Corrections, pursuant to Section 47-7-3(1)(f), would have administratively converted a life imprisonment sentence to a sentence of life imprisonment without parole eligibility. All of this having been said, so that we are crystal clear on this point, notwithstanding the provisions of Section 99-19-101(1), consistent with the legislative intent expressed via Section 47-7-3(1)(f) and this Court's decisions in *Pham*, *Flowers* and their progeny, the sentencer (jury or judge) in a capital case tried pursuant to Section 99-19-101, has in reality only two sentencing options – death, or life imprisonment without parole eligibility.

¶48. Byrom fails in her argument on this point however, because she has shown no actual prejudice in being informed that one of the possible sentences to be considered by the trial judge was that of life imprisonment. We do not interpret her claim to be that she understood that by waiving a jury, the trial judge somehow became uniquely empowered with this third sentencing option of life imprisonment which would not have been available to the sentencing jury. We further do not interpret Byrom's claim to be that she waived the jury at sentencing only because she was informed that the trial judge had this third sentencing option of life imprisonment. In the end, Byrom had every opportunity to raise this issue on direct appeal, but she failed to do so; therefore, pursuant to statute, she is procedurally barred from attacking the death sentence which was imposed by the trial judge, as opposed to the jury. Miss. Code Ann. Section 99-39-21(1) (Supp. 2005) states:

27

Failure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal, regardless of whether such are based on the laws and the Constitution of the state of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver.

Thus, while the statute permits this Court to apply a procedural bar due to a waiver, we have the discretion to grant relief from the waiver "upon a showing of cause and actual prejudice." Section 99-39-21(4) states that the term "cause" is "defined and limited to those cases where the legal foundation upon which the claim for relief is based could not have been discovered with reasonable diligence at the time of trial or direct appeal." Section 99-39-21(5) states that the term "actual prejudice" is "defined and limited to those errors which would have actually adversely affected the ultimate outcome of the conviction or sentence."

¶49. Therefore, for the reasons stated, in considering Byrom's assertions and reviewing the record before us, we conclude, without question, that Byrom has failed to show cause and actual prejudice by being informed of the trial judge's "three sentencing options" en route to making a decision to waive a jury determination of the appropriate sentence and placing this decision in the hands of the trial judge. Thus, this issue is procedurally barred pursuant to Miss. Code Ann. Section 99-39-21(1) (Supp. 2005).

28

### III. WHETHER THE INDICTMENT WAS FATALLY DEFECTIVE DUE TO THE FAILURE TO INCLUDE THE STATUTORY AGGRAVATING FACTORS, AFFORDING BYROM INADEQUATE NOTICE OF THE SPECIFIC OFFENSES OF WHICH SHE WAS TO DEFEND, IN VIOLATION OF THE UNITED STATES AND MISSISSIPPI CONSTITUTIONS.

¶50. Byrom next argues that her indictment was defective because the aggravating factors were not included in the indictment. She cites *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).

¶51. The State first argues that Byrom is procedurally barred from raising this issue because she did not raise it at trial. The application of procedural bar is questionable on this issue. Byrom was tried in November, 2000, and *Ring* was decided in 2002. However, the question of procedural bar notwithstanding, this issue is unquestionably without merit.

¶52. As noted by the State, this issue was raised, considered and found to be without merit by this Court in *Brown v. State*, 890 So.2d 901, 917-18 (Miss. 2004); *Gray v. State*, 887 So.2d 158 (Miss. 2004); and *Mitchell v. State*, 886 So.2d 704 (Miss. 2004). In *Brown*, we stated:

> Brown urges that the prosecution must include in the indictment any aggravating factors which it intends to prove at the sentencing phase of the trial, and that because his indictment did not include a statutory aggravating factor or a mens rea element it is constitutionally infirm.
>
> This is not our law. The major purpose of any indictment is to furnish the accused a reasonable description of the charges so an adequate defense might

29

be prepared. *See Williams v. State,* 445 So.2d 798, 804 (Miss.1984). Accordingly, *all* that is required in the indictment is a clear and concise statement of the elements of the crime charged. *Id.* at 804. Our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment. *Williams,* 445 So.2d at 805. Thus, *every time* an individual is charged with capital murder they are put on notice that the death penalty may result. *See Stevens v. State,* 867 So.2d 219, 227 (Miss. 2003). This is the law of our state.

Brown urges that the United States Supreme Court cases of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), bolster his position. They do not. We have previously discussed these cases at length and concluded that they address issues wholly distinct from our law, and do not address indictments at all. *See Stevens,* 867 So.2d at 225- 27. This issue is without merit.

890 So.2d at 917-18. (Emphasis added). The law of our state is unequivocal that in cases where consideration of the death penalty is applicable, there is no requirement that the applicable statutory aggravating factors be included in the indictment. Thus, this issue is without merit.

### IV. WHETHER THE EXCLUSION OF CERTAIN EVIDENCE DENIED BYROM A FUNDAMENTALLY FAIR TRIAL.

¶53.   Byrom next argues exclusion of "the home video"[2] and "the jailhouse letters" was erroneous and denied her a fair trial. The State argues these issues were raised and considered on direct appeal and, as such, Byrom is barred from raising them here pursuant to Miss. Code Ann. Section 99-39-21(1)(3). We agree and find this issue is procedurally

---

[2]This home video contained scenes depicting Byrom engaged in what she characterized as "forced sexual acts" at the insistence of her husband.

barred. However, procedural bar notwithstanding, we also find this issue to be without merit.

In considering this issue on direct appeal, we stated:

> Byrom was given sufficient latitude to convey her theory of abuse to the jury....Byrom's theory of abuse was established through other evidence. The jury received evidence that Byrom, Sr. physically abused Byrom and Junior; that Byrom, Sr. forced Byrom to have sex with other people and foreign objects; that Byrom, Sr. was obsessed with pornography; and, that Junior, not Gillis, supposedly killed Byrom, Sr. The jury did not need this home video to be convinced of Byrom, Sr.'s abusive and pornographic tendencies. We find the trial court did not commit error in excluding the home video of Byrom. Therefore, this issue is without merit.

*Byrom*, 863 So.2d at 854. Byrom also makes a similar argument concerning certain letters written by her son, Edward, Jr., to Byrom while they were in prison. At trial, the defense attempted to use the letters to impeach Junior without having disclosed their existence to the State. Because of this failure to disclose, the trial judge excluded the letters. On direct appeal this Court concurred with the trial judge's ruling. *See Byrom*, 863 So.2d at 868-872. Having alternatively considered this issue on its merits, we find it is as a matter of law without merit.

## V. WHETHER THE DEATH SENTENCE WAS DISPROPORTIONATELY IMPOSED.

¶54. Byrom next argues her death sentence was disproportionately imposed. She raised this issue on direct appeal, alleging there was insufficient evidence of the single aggravating factor, that the murder was committed for pecuniary gain, and that the trial judge failed to give proper consideration to the mitigating factors she requested. This Court found no error in the trial judge's decision. *See Byrom*, 863 So.2d at 881-83.

31

¶55.    Byrom now argues her death sentence is disproportionate because (1) her son and Joey

Gillis, one of whom shot and killed the victim, received lesser sentences, and (2) the decision

in *Ring v. Arizona* mandates that a jury, and not a judge, make the findings as to aggravating

and mitigating factors that lead to the death sentence.  The State argues first that because this

issue was raised on direct appeal, Byrom is procedurally barred by res judicata from raising

the issue under Miss. Code Ann. Section 99-39-21 (3).   We agree that this issue is

procedurally barred, but procedural bar notwithstanding, we consider the merits of this issue.

¶56.    Though Byrom did raise this issue on direct appeal, she supports this issue with

different arguments here.  Byrom first argues Mississippi's statutory scheme relating to

felony murder cases fails to sufficiently narrow the class of persons who are death-eligible

as a result of the commission of felony murder,  citing *Tison v. Arizona*, 481 U.S. 137, 107

S.Ct. 1676, 95 L.Ed.2d 127 (1987); *Enmund v. Florida*, 458 U.S. 782 , 102 S.Ct. 3368, 73

L.Ed.2d 1140 (1982); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859

(1976); and, *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The

State responds first that Byrom was convicted of capital murder "which is perpetrated by any

person who has been offered or has received anything of value for committing the murder"

under Miss. Code Ann. section 97-3-19(2)(d), and that this is thus not a felony murder case.

Second, the State points out that even if the merits of this argument were reached, this Court

has considered this argument in other cases and has found it to be without merit.  *See*

*Grayson v. State*, 879 So.2d 1008, 1013 (Miss. 2004).

32

¶57. Byrom also argues that either her son or Joey Gillis actually fired the shots that killed Edward Byrom, Sr., and because they did not receive the death penalty, and she did, her sentence is disproportionately severe, citing *Randall v. State*, 806 So.2d 185 (Miss. 2001), and *White v. State*, 532 So.2d 1207 (Miss. 1988). Edward, Jr. pled guilty to conspiracy to commit capital murder, accessory before the fact to grand larceny, and accessory before the fact to burglary of a dwelling with intent to commit assault. He was sentenced to a total of fifty years, with twenty years suspended and thirty years to serve. Gillis pled guilty to conspiracy to commit murder and accessory after the fact to capital murder and received a total of twenty-five years, with ten years suspended and fifteen years to serve. In *White*, the defendant's death sentence was reversed because there was insufficient evidence supporting the *Enmund* factors. 532 So.2d at 1220-22. In *Randall*, we stated:

> Randall correctly assert[ed] that all of the cases relied on by the State involve a defendant who was (1) found to have killed, attempted to kill and/or intended to kill, (2) was at least the instigator or mastermind of the crime, and/or (3) the codefendant was also sentenced to death or was not subject to sentencing by a jury. While the codefendants testified that Randall and Stokes both pointed guns at Daniels, there is no proof as to who actually killed him. The jury specifically declined to find that Randall killed or attempted to kill Daniels. Additionally, Stokes only received life in prison and the other co-defendants entered into plea agreements which spared their lives. Because the only fact, as found by the jury, was that Randall "contemplated" lethal force, the death sentence was disproportionate based on the findings of fact as determined by the jury. However, on retrial, other facts may be developed sufficient to support a death sentence.

*Randall*, 806 So.2d at 234.

¶58. The State does not respond to this argument. Inasmuch as the prosecution presented evidence which supported the finding that Byrom intended that her husband be killed and that she was the instigator or mastermind of the crime, Byrom's case may be distinguished from *Randall*. This Court reached similar decisions in *Simmons v. State*, 869 So.2d 995 (Miss. 2004) and *Ballenger v. State*, 667 So.2d 1242 (Miss. 1995), *rev'd on other grounds*, 761 So.2d 214 (Miss. 2000), in affirming death sentences for persons who did not actually cause the death of the victim.

¶59. Byrom next argues her death sentence is disproportionate because the trial judge alone determined the mitigating factors did not outweigh the aggravating factors. She argues that under the recent decision of *Ring v. Arizona*, 536 U.S. 584 (2002), any aggravating circumstance in a capital case must be found by a jury beyond a reasonable doubt. The State does not respond to this argument.

¶60. While there is little authority on whether the right to a jury sentencing discussed in *Ring* may be waived, other states considering this question have found that a defendant who knowingly and intelligently waives a jury in the penalty phase of a capital case also waives any argument based on *Ring*. *See Bryant v. State*, 901 So.2d 810 (Fla. 2005); *Thacker v. State*, 100 P.3d 1052 (Okla. Crim. App. 2004). We find here, because the record clearly reveals Byrom made a voluntary, knowing and intelligent waiver of her right to have the jury determine her sentence, it necessarily follows that she has waived her rights under *Ring*.

34

¶61. Byrom finally cites cases from other states which she claims are more "factually similar" to her case, including *Commonwealth v. Grimshaw*, 576 N.E.2d 1374 (Mass. App. Ct. 1991); *State v. Anderson*, 785 S.W.2d 596 (Mo. Ct. App. 1990); *Boyd v. State*, 581 A.2d 1 (Md. 1990); and *People v. Yaklich*, 833 P.2d 758 (Colo. Ct. App. 1991). These cases involve situations where women who were allegedly battered by their husbands hired or otherwise persuaded someone to kill their husbands. Unlike Byrom's case, none of the women in these cases received the death penalty, and it is unclear from a reading of these cases if any of these women were even eligible for the death penalty. In some of the cases there is little or no analysis of the sentence. We find these cases to be of no benefit to Byrom.

¶62. For these reasons, we find this issue to be without merit.

**VI. WHETHER BYROM IS ENTITLED TO CLAIM ACTUAL INNOCENCE TO ALL CHARGES LEVIED AGAINST HER BASED ON NEWLY DISCOVERED EVIDENCE OF CONSTITUTIONAL DIMENSION, NOT KNOWN AT THE TIME OF THE TRIAL OR ON DIRECT APPEAL, THUS CAUSING THE SAME AS AN EXEMPTION TO THE PROCEDURAL DEFAULT OF ALL CLAIMS OF A CONSTITUTIONAL NATURE.**

¶63. Byrom next alleges "actual innocence" to the charges which were brought against her by the State of Mississippi, and in support of her claim states "her wrongful conviction is of such constitutional dimension that it necessitates that this Court extend the actual innocence exemption to procedural default of constitutional claims contained in her petition." Byrom cites several United States Supreme Court and federal court decisions on the "actual

innocence" exception to the procedural bar raised in successive, abusive or defaulted federal habeas claims. It is unclear whether Byrom is attempting to add this argument to the already existing exceptions to the procedural bar found in Miss. Code Ann. Section 99-39-27 (9), or whether she merely asserts this argument as additional support for state law statutory exceptions, as actual innocence sounds similar to the "newly discovered evidence" exception found in Section 99-39-27(9).

¶64. A review of our opinion on Byrom's direct appeal reveals that Byrom did not argue that her conviction or sentence were against the weight or sufficiency of the evidence. Any such argument now is thus procedurally barred. As for her claim of actual innocence, Byrom cites her affidavit, Exhibit 2 to her petition, which includes the following:

> I am innocent of the charges for which I have been convicted and sentenced. My trial attorneys, in violation of my fundamental constitutional rights to due process and those under the Sixth Amendment, provided me with ineffective assistance of counsel throughout my entire trial.

> I did not contract with anyone to kill Edward Byrom, Sr. Specifically, I did not ask Joey Gillis to kill my husband. At the time of Edward Sr.'s death, I was a patient at Iuka Hospital. My physician, Dr. Ben Kitchens, admitted me for treatment of pneumonia.

> My son, Edward Byrom, Jr., offered perjured testimony in exchange for a plea arrangement that would allow him to serve a limited number of years in prison and then be released on post-released (sic) supervision.

Otherwise, Byrom merely states that findings made by the jury on the factual matters at issue and the judge during sentencing were wrong. Because Byrom has submitted nothing new

36

concerning the evidence in this case, and in considering our analysis of Byrom's ineffective assistance of counsel claim under Issue I, we find this issue to be without merit.

> **VII.   WHETHER BYROM WAS DENIED HER RIGHTS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION AND MISSISSIPPI LAW DUE TO THE CUMULATIVE EFFECT OF THE ERRORS AT HER CAPITAL TRIAL.**

¶65.   Although we have found no reversible error in the guilt phase or the sentencing phase of her trial, Byrom requests of us that we reverse her conviction and sentence due to the cumulative effect of certain errors committed during her trial.  We addressed and considered this issue on Byrom's direct appeal.  ***Byrom***, 863 So.2d at 847.  Accordingly, Byrom is now procedurally barred in this PCR proceeding from raising this issue again, pursuant to Miss. Code Ann. Section 99-39-21(3).  Procedural bar notwithstanding, we address this issue on its merits.

¶66.   In the past, we have admittedly taken different approaches in discussing the cumulative effect of trial errors.  In ***McFee v. State***, 511 So.2d 130 (Miss. 1987), we stated that "[a]s there was no reversible error in any part, so there is no reversible error to the whole."  ***Id.*** at 136.  On the other hand, in ***Jenkins v. State***, 607 So.2d 1171 (Miss. 1992), we stated that "errors in the lower court that do not require reversal standing alone may nonetheless taken cumulatively require reversal."  ***Id.*** at 1183 (citing ***Griffin v. State***, 557 So.2d 542, 553 (Miss. 1990)).  However, in being confronted with this issue on Byrom's direct appeal, we stated:

37

What we wish to clarify here today is that upon appellate review of cases in which we find harmless error or any error which is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect. That having been said, for the reasons herein stated, we find that errors as may appear in the record before us in today's case, are individually harmless beyond a reasonable doubt, and when taken cumulatively, the effect of all errors committed during the trial did not deprive Michelle Byrom of a fundamentally fair and impartial trial. We thus affirm Byrom's conviction and sentence.

*Byrom*, 863 So.2d at 847. When we consider the totality of the record in this case, we conclude that Byrom did not receive a perfect trial, nor was she entitled to one. However, we conclude that any error committed during the guilt and/or sentencing phases of Byrom's trial was harmless beyond a reasonable doubt, and, even when considering the cumulative effect of any harmless errors, we find that there was no cumulative prejudicial effect such that Byrom was denied her right to a fundamentally fair and impartial trial by both the convicting jury and the sentencing judge. We thus find this assignment of error to be without merit.

### CONCLUSION

¶67. After a meticulous review of the record, for the reasons stated, we find no error requiring vacation of the judgment of conviction and imposition of the death penalty. Accordingly, for the reasons herein stated, we find that Michelle Byrom is not entitled to seek post-conviction relief; therefore, her post-conviction relief motion is denied.

¶68. **PETITION FOR POST-CONVICTION RELIEF IS DENIED.**

38

**SMITH, C.J., WALLER, P.J., EASLEY AND RANDOLPH, JJ., CONCUR. DICKINSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J. COBB, P.J., JOINS IN PART. DIAZ, J., NOT PARTICIPATING.**

**DICKINSON, JUSTICE, DISSENTING:**

¶69. On behalf of the majority, Justice Carlson's excellent analysis of the assignments of error in this case are, in my view, exactly correct, with the sole exception of Michelle Byrom's claim that her counsel was constitutionally ineffective during the sentencing phase of her trial. I now take the liberty graciously afforded me by our procedure to document my views which are contrary to those of the majority.

¶70. I begin by stating that I fully concur with the majority in finding no reversible error in the jury verdict of guilt. It is only with the sentencing, as it occurred in this case, that I find constitutional problems.

¶71. It is not for me to say whether Michelle Byrom should be put to death or serve life in prison for her involvement in the murder of her husband. But the enormous significance of possible error in ordering the death penalty requires that we be particularly vigilant in reviewing the record for possible constitutional error. In this case, Byrom claims violation of her constitutional right to effective counsel, and to her right not to be put to death absent a unanimous verdict by twelve jurors. After careful and repeated review of the record and applicable law, I find her counsel was constitutionally ineffective, and I further am of the opinion that, under the circumstances of the case, the trial judge was without authority to impose the death penalty. For these reasons, I respectfully dissent, in part.

39

*Ineffective assistance of counsel.*

¶72. A criminal defendant's counsel is ineffective when "counsel's conduct so undermine[s] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The record, in my view, clearly demonstrates that Michelle Byrom's counsel was - in the constitutional sense - ineffective during the sentencing phase of her trial.

¶73. It is no small thing for this Court to conclude that an attorney ineffectively represented a client charged with a capital crime, particularly when the trial results in imposition of the death penalty. Nevertheless, justice requires that we carefully and faithfully require attorneys who choose to engage in such representation to adhere to strict standards of competency and skill. As this Court has stated, "[t]he focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Stringer v. State,* 454 So.2d 468, 477 (Miss. 1984). I fully recognize that no defendant is entitled to a perfect defense, and ineffective assistance of counsel, in the constitutional sense, requires not only deficient representation, but also a finding that the deficiencies resulted in prejudice to the defendant's case. *Strickland,* at 687.

¶74. That said, it seems to me almost elementary that Byrom's counsel was ineffective in this case. They swore in affidavits that they persuaded Byrom to waive her right[3] to have a

---

[3]As will be discussed below, having a jury sentence a defendant in a capital case tried to a jury is not a right, but rather a statutory requirement.

40

jury determine her sentence, even though neither attorney felt certain that Byrom understood the ramifications of her decision. Not only did counsel recommend that she allow the trial judge to decide her punishment, they failed miserably in presenting mitigating circumstances to the court during the sentencing phase of the trial. And the mitigating circumstances in this case were overwhelming.

¶75. The physical abuse Byrom suffered from her husband was no ordinary physical abuse. Not only did she, *for years,* suffer severe physical abuse at the hand of her husband, but she was made by him to have sex with others while he videotaped. So severe was her abuse, in fact, that *for three years Byrom ingested rat poison* to obtain admittance into the hospital, hoping to and escape the abuse and gain sympathy. There is no dispute that these things occurred.

¶76. In addition to the abuse, Byrom suffered from numerous health problems including Munchausen Syndrome, lupus, pneumonia, severe depression, alcohol dependence, borderline personality disorder, anemia, chronic pain, hypertension. At the time of her husband's murder, Byrom was on nine different medications to treat these ailments.

¶77. Byrom's childhood was no better than her married life; perhaps worse. Before running away from home at age fifteen, she was physically and sexually abused by her stepfather, who used her as a prostitute.

¶78. With what many attorneys would consider a cornucopia of mitigating circumstances, and with Byrom's life in the balance, her counsel called *no witnesses* during the sentencing

41

phase of her trial. Instead, they placed into evidence only two medical reports detailing her physical and mental condition, and nothing more. It completely defies logic and all reasonable consideration for one to conclude that one trial judge - any trial judge - would be more likely to find these mitigating factors compelling than twelve jurors, without a single dissenting voice. I have attempted to conjure up in my imagination a more egregious case of ineffective assistance of counsel during the sentencing phase of a capital case. I cannot.

¶79. In recommending that Byrom waive her so-called *right* to have a jury hear the mitigating circumstances, and in presenting to the court little in mitigation of the death penalty, I believe Byrom's counsel were certainly ineffective. I further believe justice was subverted in this case. I am convinced that Byrom's jury was likely to have at least one member who would be unwilling to agree to the death penalty under the circumstances of this case.

¶80. Finally, I believe the trial judge, who was forced to sentence Byrom without being fully advised in the premises, deserved to hear more than a medical recitation of Byrom's history and circumstances. The trial judge deserved to hear Byrom describe how, as a child, she was raped and sold as a prostitute by her stepfather. The trial judge deserved to hear doctors and other witnesses describe terror which compelled Byrom to ingest rat poison to escape the abuse she suffered at the hand of her husband. The trial judge certainly deserved to have more before him than a mere medical report, before deciding whether Byram should be put to death.

*Miss. Code Ann. § 99-19-101*

¶81.    Additionally, it is obvious to me that the trial judge was not authorized by statute to sentence Byrom in this case.  *See* Miss. Code Ann. § 99-19-101.  Our death sentencing statute requires that defendants who are tried by a jury must be sentenced by a jury.  The only two instances where the statute grants authority to the trial judge, rather than the jury, to impose the sentence in a capital case are where the defendant waived the trial jury or the defendant pleaded guilty to the crime as charged.  Even in those two limited circumstances the statute provides that a jury should sentence the defendant unless both the State of Mississippi and the defendant agree in writing to have the trial judge impose the sentence.  Only if these requirements are met does the statute give the trial judge the authority to sentence a defendant.  Byrom was tried and found guilty by a jury .  She did not waive the trial jury and she did not plead guilty.  We should follow the statute and require that she be sentenced by a jury.

¶82.    Sentencing by a jury is not the defendant's *right* - but rather a *requirement* of statute.  Neither of the statutory exceptions which allow the trial judge to impose the death penalty was present in Byrom's case.  Therefore, in my view, the trial judge lacked statutory authority to impose the death penalty in this case.  Byrom and the State of Mississippi cannot merely agree for the trial judge to have sentencing authority where the statute does not give the judge such power.

¶83. My view on the interpretation of this statute is not new. In ***Bishop v. State,*** 812 So. 2d 934 (Miss. 2002), this Court held that Miss. Code Ann. Section 99-19-101 "does not contain a provision for the waiver of a jury during the sentencing phase of a trial." ***Id***. at 945. Nevertheless, the ***Bishop*** Court refused to reverse the sentence of death imposed by the trial judge because "case law and common practice show that the right to a jury during the sentencing phase may be waived." ***Id***. This Court's final determination in ***Bishop*** notwithstanding, it is my firm conviction that neither case law nor common practice can qualify the trial judge to impose the sentence of death. The Legislature has the exclusive authority, power and responsibility to decide who may impose the death penalty. Even assuming *arguendo* that a defendant could waive sentencing by the jury, that does not speak to the questions of who has statutory power to impose the sentence of death once the jury is waived. As the ***Bishop*** Court concluded, because the statute makes no provision for such circumstances, who (if not the Legislature) is to say the trial judge may step in and order someone be put to death? Although the ***Bishop*** Court without statutory authority, would grant to the trial judge that enormous power based upon "case law and common practice," I would not.

¶84. Because there is no provision in any statute which would allow a defendant convicted by a jury to waive sentencing by a jury and be sentenced to death by a judge, it is not only patently unwise and ineffective but also unlawful for an attorney to recommend their client *waive* sentencing by a jury.

¶85.    For the reasons stated, I would grant Byrom's request for post conviction relief and reverse and remand for re-sentencing by a jury.  Even if I am incorrect in my interpretation of the statute, then this matter should be reversed and remanded for re-sentencing by the trial court following a hearing wherein Byrom is afforded the opportunity to fairly present, through competent counsel, her considerable mitigating circumstances.

**GRAVES, J., JOINS THIS OPINION.  COBB, PJ., JOINS THIS OPINION IN PART.**