# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 28, 2013

No. 11-70026

Lyle W. Cayce
Clerk

MICHELLE BYROM,

Petitioner–Appellant

v.

CHRISTOPHER B. EPPS, COMMISSIONER,
MISSISSIPPI DEPARTMENT OF CORRECTIONS

Respondent–Appellee

Appeal from the United States District Court
for the Northern District of Mississippi
(06-CV-142)

Before DAVIS, SMITH, and PRADO, Circuit Judges.

PER CURIAM:[*]

Michelle Byrom ("Byrom") was charged with capital murder following the
death of her husband, Edward Byrom, Sr. ("Edward"). The jury found Byrom
guilty, and the state court judge sentenced her to death. Byrom's appeal and
petition for post-conviction relief were both denied by the Mississippi Supreme
Court. Thereafter, Byrom petitioned for federal habeas relief on twelve separate
grounds. The district court denied Byrom's petition, but granted her request for

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 11-70026

a certificate of appealability ("COA") on five claims: (1) whether evidence was improperly suppressed; (2) whether Byrom had statements taken in violation of her privilege against self-incrimination; (3) whether the trial court failed to consider all mitigating evidence; (4) whether her waiver of a jury sentencing was valid;[1] and (5) whether counsel was ineffective in failing to investigate and present all available mitigating evidence. In addition to appealing most of those claims for which a COA was granted, Byrom has moved for an expanded COA on two issues considered by the district court: (1) whether the exclusion of jailhouse letters from Byrom's son as a discovery sanction violated Byrom's rights; and (2) whether Byrom received ineffective assistance of counsel when her trial attorney committed a discovery violation, thereby causing the exclusion of her son's jailhouse letters. For the reasons that follow, we deny Byrom's motion for an expanded COA and deny her habeas petition.

## I.     **Factual and Procedural Background**

On June 4, 1999, Byrom was admitted to the Iuka Hospital in Iuka, Mississippi with double pneumonia. Her admission was part of a recurring series of illnesses caused in part by substance abuse and self harm.[2] She was dropped off at the hospital by her husband, Edward, who then returned home. Later that day, responding to a 911 call from Byrom's son, Edward Byrom, Jr. ("Junior"), police found Edward slumped over a coffee table in the family's home. Edward had been shot four times in the chest with his own nine-millimeter pistol. After questioning Byrom and Junior in the hours after the murder, the

---

[1] Despite receiving a COA as to whether Byrom validly waived her jury sentencing, Byrom's brief does not contain any information or argumentation on this point. Accordingly, we deem it waived.

[2] Byrom received a number of medications upon being admitted to the hospital and throughout her stay. These drugs included Talwin, a painkiller; Flexeril, a muscle relaxant; Prilosec, for stomach acid; Restoril, a sleep aid; Synthroid, a thyroid medication; Prednisone and Plaqueril, to treat lupus; Zoloft, an antidepressant; and Librium, for the agitation associated with alcohol withdrawal.

police came to believe that Byrom had hired one of Junior's friends, Joey Gillis ("Gillis"), to murder Edward in exchange for $15,000 of Edward's life insurance policy. All three individuals—Byrom, Junior, and Gillis—were subsequently arrested.

By all accounts, the Byrom household was a particularly discordant place. Byrom and Edward frequently fought about money-related issues, and Junior would sometimes intervene when the fights escalated. Edward was physically, sexually, and verbally abusive to Byrom. He often abused Junior as well, generally in response to Junior's partying, drinking, and drug use. Byrom and Edward themselves drank frequently, and it appears the family's fights were worse when alcohol was involved. Junior claims that, in the six months leading up to Edward's murder, the family would engage in heated arguments that involved yelling and cursing at least twice a week. Byrom also suffered verbal, physical, and sexual abuse as a child at the hands of her stepfather, which resulted in her leaving home at around age fifteen.

According to Byrom and Junior, Edward frequently withdrew into the family's entertainment room when he was home, often eating and sleeping there. That room, which had shag carpet on the walls and black plastic over the windows, had functioned as a sound studio at one point. However, Byrom claims that Edward had more recently used the room to indulge his addiction to pornography. As part of that addiction, Byrom alleges that Edward forced her to engage in sexual acts, some of which he videotaped. Byrom's claims were partially substantiated by videotapes recovered by police.

Byrom claims that Edward's recurrent threats and abuse prevented her from leaving him. Instead, she arranged to have Edward murdered. Junior testified that Byrom approached him about having Edward murdered sometime in May 1999, after a particularly rowdy party at which Edward became belligerent and abusive to both Byrom and Junior. Junior testified that,

3

No. 11-70026

approximately one week before the murder, he asked his friend, Gillis, about murdering Edward. Gillis would either commit the murder himself or find someone else to do it and would receive $15,000 in exchange. After two failed attempts, Edward was murdered on June 4, 1999.

Although the precise order of Byrom's and Junior's initial interviews with police is disputed, it seems that police became suspicious of Junior at the crime scene and took him into custody for questioning as a result.[3] An investigator from the Mississippi Highway Patrol went to the hospital to interview Byrom, but police did not suspect Byrom's involvement at the time; they went to ask about weapons in the home and the relationship between Edward and Junior. However, Junior made suspicious statements during his interview with the police, which prompted them to return to the hospital at around 10:47 p.m. to question Byrom further. It was during that interview that Byrom began implicating herself, Junior, and Gillis in a murder-for-hire plot. On October 21, 1999, Byrom was indicted under Miss. Code Ann. § 97-3-19(2)(d), which criminalizes murder perpetrated by a person who has been offered or who has received anything of value for committing a murder, as well as all parties to the murder.

During their incarceration, Byrom and Junior exchanged a number of letters. In at least two of these letters—letters that police did not intercept—Junior accepts complete responsibility for Edward's murder and disclaims the existence of a murder-for-hire conspiracy. In one of the letters, Junior claims he alone murdered Edward and that he did so for purely personal reasons. In the other letter, Junior describes the murder in detail. Defense counsel came into

---

[3] Police were suspicious of Junior for multiple reasons. First, Junior told the 911 dispatcher that his father had been shot. When police arrived, however, Junior asked whether Edward had suffered a heart attack. Second, Junior had cuts on his knuckles and blood on the back of his pants. It was later determined that the blood was Junior's. The blood and the cuts were supposedly the result of punching a door after discovering Edward's body.

4

possession of the letters some time before trial. Then, at Byrom's pretrial hearing in October 2000, defense counsel alluded to the existence of letters, acknowledging the possession of materials intended for use as impeachment evidence against Junior if he testified consistently with the prosecution's murder-for-hire theory.[4] Defense counsel was told to produce the material or risk its exclusion at trial. Counsel refused.

At trial, Junior testified against his mother in support of the prosecution's murder-for-hire theory. During cross-examination, defense counsel attempted to impeach Junior using the first letter to suggest that there was no murder-for-hire plot. The prosecution objected because the letter had not previously been disclosed. Byrom's attorney claimed that the applicable rule did not mandate pretrial disclosure since Junior and the letter were not part of the defense's case-in-chief. The court recessed for the day to consider the issue, and the prosecution was given an opportunity to question Junior about the letters. When asked whether he had withheld any other evidence, Byrom's attorney stated that they had "other impeachment evidence" that they intended to use to "impeach the daylights" out of Junior. Counsel was admonished that further nondisclosure would result in exclusion of the evidence and further delay; nondisclosure was at counsel's "own peril."

The next day, the court determined that the letter would be excluded as a sanction for counsel's deliberate discovery violation. The court, however, limited the scope of its sanction. Byrom's counsel was allowed to ask Junior about the letter's contents using direct quotes, but counsel could neither handle the letter nor reference its existence in front of the jury. The court acknowledged that this amounted to splitting hairs, but nevertheless felt that this remedy properly redressed counsel's discovery violation. Counsel attempted

---

[4] Junior agreed to testify against his mother in exchange for a plea bargain to lesser charges in the murder-for-hire plot.

to impeach Junior with the second letter as well, which resulted in a second recess and an identical sanction.

During cross-examination of Junior, counsel was able to read directly from the letters, and Junior admitted to many of the facts Byrom's attorney sought to establish. For instance, Junior admitted to telling different stories to different people regarding his role in Edward's death; Junior admitted that he wrote to his mother taking responsibility for the murder; and he admitted that he had told others that no murder-for-hire conspiracy existed. Junior nevertheless denied other details from the letters, including that he alone killed Edward.

On re-direct, the prosecution questioned Junior about the circumstances surrounding the jailhouse letters. Junior testified that he and Byrom had realized their letters were being intercepted and that the letters in question had been written with an audience of law enforcement officers in mind. Junior claimed that he wrote the letters at a time of deep depression, during which he was "ready to take the rap for everything."

The jury found Byrom guilty of capital murder on November 17, 2000. After her conviction, Byrom petitioned to waive her right to a jury sentencing. The prosecution concurred with Byrom's request, and the court found that Byrom had made a valid waiver of her right. At the sentencing hearing, Byrom did not present any witnesses.[5] Instead, she offered the reports of a defense expert and a court-ordered psychiatrist, as well as the medical records from a doctor. These reports and records documented Byrom's long history of abuse and illness. After considering mitigating and aggravating factors, the judge sentenced Byrom to death by lethal injection.

---

[5] Defense counsel apparently believed that the trial court had made several reversible errors prior to sentencing and—anticipating a retrial—counsel did not want the prosecution to know about their mitigation evidence. Additionally, Byrom waived her jury sentencing on the belief that doing so would create a conflict for the trial judge at the retrial and because they felt the waiver itself might be grounds for reversal.

No. 11-70026

Byrom's direct appeal and petition for post-conviction relief were both denied by the Mississippi Supreme Court. *Byrom v. State*, 863 So. 2d 836 (Miss. 2003); *Byrom v. State*, 927 So. 2d 709 (Miss. 2006). Byrom then petitioned the district court for federal habeas relief on twelve grounds. The district court denied Byrom's petition in its entirety, but granted a COA as to five claims. *Byrom v. Epps*, 817 F. Supp. 2d 868 (N.D. Miss. 2011). Byrom appealed to this Court on four of the five claims for which the district court granted a COA. She also sought an expanded COA as to two claims rejected below.

## II.    Expanded Certificate of Appealability

### A.    Applicable Law

As a jurisdictional matter, under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), petitioners may not appeal the denial of habeas relief without securing a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1); *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003). A COA is only warranted if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, Byrom must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller–El*, 537 U.S. at 336 (quotation marks omitted).

When reviewing a district court's denial of a COA, this Court must issue a COA if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 338. "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. Moreover, "[i]n death penalty cases, any doubts as to whether the COA should issue are resolved in favor of the petitioner." *Moore v.*

No. 11-70026

*Quarterman*, 534 F.3d 454, 460 (5th Cir. 2008) (citing *Lamb v. Johnson*, 179 F.3d 352, 356 (5th Cir. 1999)).

Here, the district court granted Byrom a COA as to five claims and denied the rest. Byrom has since moved for an expanded COA regarding two of her claims. First, Byrom alleges that the trial court's exclusion of her son's jailhouse letters violated her Sixth and Fourteenth Amendment constitutional rights. Second, Byrom claims she received ineffective assistance of counsel when her trial attorney willfully withheld the jailhouse letters, thereby causing their exclusion at trial. As such, the Court must examine the district court's denial of these claims to determine whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Michael Williams v. Taylor*, 529 U.S. 420, 484 (2000).

### B.    Exclusion of the Jailhouse Letters

Byrom received at least two letters from Junior while they were both incarcerated. In these letters, which were purportedly written with the intention that law enforcement intercept them, Junior took full responsibility for Edward's murder and disclaimed the existence of a murder-for-hire scheme. These letters were given to Byrom's attorney, who intended to use the letters as impeachment evidence if Junior testified consistently with the prosecution's theory of the case against Byrom.

Before trial began, the court warned Byrom's counsel to disclose impeachment evidence to the prosecution or risk discovery sanctions at trial. Disregarding the court's admonition, counsel withheld the letters until they were unveiled during Junior's cross-examination. Counsel did so for strategic surprise, as well as to ensure that Junior would remain a key prosecution witness. Byrom's attorney also believed that his tactic was permissible under

8

the relevant rule, a claim the court did not accept.[6] As a sanction, the trial court barred counsel from referencing or handling the letters in front of the jury. Nevertheless, counsel was permitted to question Junior about the letters and to read directly from the letters while questioning him. During cross-examination, Junior admitted to offering different accounts of the murder to different people, including previous statements taking complete responsibility for the murder. Junior did, however, ultimately deny direct responsibility for his father's death. On re-direct, Junior said he took responsibility for the murder in the letters because they were written during a time of deep depression and that he did so to exonerate Byrom and Gillis.

The Mississippi Supreme Court, on direct appeal, rejected Byrom's claim that the letters' exclusion was improper. *Byrom v. State*, 863 So. 2d 836, 869–71 (Miss. 2003). The court analyzed the relevant state discovery rule and determined that the trial court followed the correct procedure and reached an appropriate outcome. *Id.* at 868–71. That same court also rejected Byrom's assertion that the exclusion was prejudicial since Byrom's counsel was nevertheless able to elicit testimony from Junior that favored Byrom's theory of the case using the letters' contents. *Id.* at 871.

On review, the district court deferred to the state court's interpretation of its own evidentiary rules since it did not appear that the court was attempting to evade a federal issue. *Byrom v. Epps*, 817 F. Supp. 2d 868, 887 (N.D. Miss. 2011). The district court found that it was not improper to exclude direct

---

[6] In Mississippi, a reciprocal discovery rule required that defense counsel disclose "the contents of any statement, written, recorded or otherwise preserved" for "all witnesses in chief which the defendant may offer at trial[.]" URCCC 9.04(C)(1). Byrom contended that this rule did not require disclosure of Junior's letters because "they were to be offered for impeachment purposes only and not as substantive evidence in her case-in-chief." *Byrom*, 863 So. 2d at 868. Based on prior precedent, the Mississippi Supreme Court rejected Byrom's claim because the relevant rule is concerned with discouraging the sort of "trial by ambush" that counsel had attempted. *Id.* at 869 (quoting *Coates v. State*, 495 So.2d 464, 467 (Miss. 1986)).

references to the jailhouse letters as a sanction for willfully withholding them prior to trial. *Id.* Further, the sanction was carefully crafted to let defense counsel "question Junior extensively from the letters in order to provide the defense with the opportunity to present its theory of the murder." *Id.* at 887–88. In fact, trial counsel read portions of the letters verbatim. *Id.* at 888. Because trial counsel's discovery violation was a willful, strategic tactic, and because the sanction itself deprived Byrom's defense of very little, the district court denied habeas relief. *Id.*

Byrom bases her motion for an expanded COA on *Taylor v. Illinois*, 484 U.S. 400 (1988), an attempted murder case in which the trial court excluded a defense witness because of trial counsel's willful failure to disclose the witness prior to trial. 484 U.S. at 401–02. In *Taylor*, the defendant's attorney did not disclose the existence of a witness until the second day of trial, despite the prosecution's pre-trial request for a list of all defense witnesses and an amendment defense counsel made to his witness list on the first day of trial—an amendment that did not include the withheld witness. *Id.* at 403–04. When asked about the failure to disclose his witness, defense counsel claimed to have only recently located the witness. *Id.* at 404. This, however, was not true. Before determining whether the new witness could testify, the court conducted its own examination of the witness. *Id.* During that colloquy, the witness disclosed that he and the attorney had first met months before, and that counsel visited him around a week before trial began. *Id.* at 405. The witness also made statements suggesting he had not actually witnessed the altercation at issue. *Id.* at 404–05. The trial judge concluded that complete exclusion of the witness's testimony was the appropriate sanction in light of the attorney's deliberately misleading statements and the likelihood that the witness had not in fact witnessed the altercation that gave rise to the case. *Id.* at 405.

No. 11-70026

In upholding the sanction, the Supreme Court rejected both parties' extreme positions: "Petitioner's claim that the Sixth Amendment creates an absolute bar to the preclusion of the testimony of a surprise witness is just as extreme and just as unacceptable as the State's position that the Amendment is simply irrelevant." *Id.* at 410. Instead, the Court decided that a complete evidentiary exclusion was an acceptable sanction in certain situations, though it declined to enumerate a definitive test. *Id.* at 414–16. Given the nature of the violation in *Taylor*, the Court found "the inference that [counsel] was deliberately seeking a tactical advantage . . . inescapable." *Id.* at 417. Because counsel's violation was "willful and blatant," complete exclusion was appropriate, regardless whether "prejudice to the prosecution could have been avoided." *Id.* at 416–17.

Here, Byrom attempts to distinguish the facts of *Taylor* in order to undermine the validity of the trial court's discovery sanction, which Byrom views as identical to the sanction levied in *Taylor*. Byrom characterizes the sanction here as a complete exclusion and claims that it was inappropriate because *Taylor* was not a capital murder case and the attorney in *Taylor* went so far as to deliberately mislead the court. Here, Byrom's attorney believed withholding Junior's letters fell within the letter of the law, and Byrom never misled the court. These points are well taken, but Byrom fails to appreciate how the sanction in *Taylor* differs from this case. Whereas *Taylor* involved the complete exclusion of a defense witness, the trial court here only partially restricted the extent to which counsel could use Junior's jailhouse letters.

In fact, Byrom's trial counsel was able to read directly from the letters while questioning Junior, and Junior acknowledged many of the key points counsel sought to establish. He acknowledged making inconsistent statements concerning his role in the murder and the existence of a murder-for-hire plot; and he admitted writing Byrom a letter stating that he killed his father. The

11

trial court merely precluded counsel from handling the letters in front of the jury and from specifically referring to their existence. That is, trial counsel was able to explore their theory of the case, though in a more limited capacity than originally planned. Counsel could not impeach Junior using the letters, but he nevertheless acknowledged giving inconsistent stories and claiming responsibility for the murder, points defense counsel specifically sought to elicit for the sake of undermining Junior's credibility and supporting their theory of the case.

Here, the sanction fit the violation and fell well within Byrom's Sixth Amendment rights. As the district court noted, "[Byrom's] right under the Confrontation Clause of the Sixth Amendment is to the "*opportunity* for effective cross-examination." *Byrom*, 817 F. Supp. 2d at 887 (quoting *United States v. Whitfield*, 590 F.3d 325, 363 (5th Cir. 2009)) (emphasis original). To the extent Byrom's opportunity was limited, it was due to the deliberate actions of her attorney. When counsel engages in willful discovery omissions for purely tactical reasons, the Sixth Amendment is not offended by the imposition of proportionate sanctions. *See Taylor v. Illinois*, 484 U.S. 400, 415 (1988).

For these reasons, reasonable jurists could not find the district court's assessment of Byrom's constitutional claim debatable or wrong. *Michael Williams v. Taylor*, 529 U.S. 420, 484 (2000). While the discovery violation in this case was not as egregious as the one in *Taylor*, neither was the sanction. As the district court stated:

> [t]he trial court allowed the defense a remedy for its discovery violation that still allowed it to present its theory, and it allowed the defense to question Junior extensively from the letters in order to provide the defense with the opportunity to present its theory of the murder. In fact, trial counsel read exact quotes from the letters in many instances.

*Byrom*, 817 F. Supp. 2d at 888.  Contrary to Byrom's representations, the trial court did not use the discovery violation to freely exclude defense evidence with little regard for the impact on Byrom's constitutional rights.  Rather, the court evaluated defense counsel's discovery violation in light of the circumstances of the case and fashioned a remedy that addressed the violation while still affording Byrom wide latitude to present her theory of the case.  Moreover, counsel was able to elicit much of what it wanted from Junior.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (denying federal habeas relief for trial error unless the error "had substantial and injurious effect or influence in determining the jury's verdict.").  Reasonable jurists could not find the district court's assessment of this issue debatable or wrong.  Therefore, the Court denies Byrom's motion for an expanded COA on whether the exclusion of Junior's jailhouse letters amounted to a violation of Byrom's rights.

## C.     Ineffective Assistance of Counsel

Byrom also seeks an expanded COA to argue that trial counsel's refusal to disclose Junior's jailhouse letters prior to trial constituted ineffective assistance of counsel since counsel's willful discovery violations resulted in the sanctions discussed immediately above.  However, the district court refused to consider this claim because Byrom "has never presented a State court with the argument that trial counsel performed ineffectively in failing to properly follow the rules." *Byrom*, 817 F. Supp. 2d at 888.  Because reasonable jurists would not find the district court's assessment debatable or wrong, we deny Byrom's motion. *Michael Williams v. Taylor*, 529 U.S. 420, 484 (2000).

Before state prisoners may seek habeas relief in federal courts, they must first exhaust available state remedies so as to give the state courts an opportunity to correct alleged violations of federal rights.  28 U.S.C. § 2254(b)(1)(A); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  In order to provide the "opportunity" required, the prisoner must "fairly present" her claim "in each

13

appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin*, 541 U.S. at 29 (quoting *Dunan v. Henry*, 513 U.S. 364, 365–66 (1995) (per curiam); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). *See also Smith v. Quarterman*, 515 F.3d 392, 402 (5th Cir. 2008) ("The exhaustion of state remedies, codified in § 2254(b)(1), requires a petitioner to provide the highest court of the state a fair opportunity to apply the controlling federal constitutional principles to the same factual allegations before a federal court may review any alleged errors."). If a prisoner fails to exhaust her claim, it becomes procedurally barred.

Here, Byrom has not previously claimed ineffective assistance of counsel based on trial counsel's intentional withholding of evidence. In her motion before this Court, Byrom makes two statements in response to the district court's ruling. First, Byrom claims that, "[i]n post-conviction proceedings, Byrom claimed that she was denied her constitutional right to a fair trial when the trial court excluded Junior's letters." This may be true, but such a claim does not contain an ineffective assistance of counsel claim within it. This Court addressed Byrom's claims regarding the exclusion of Junior's letters in Part II.B, *supra*.

Second, Byrom claims that, she "asserted that her trial and appellate counsel were ineffective for failing to raise this claim as raised in her post-conviction petition." It is not clear, however, that "this claim" refers to an ineffective assistance of counsel claim arising out of a willful discovery violation. This conclusion is underscored by the block quote Byrom uses to illustrate the Mississippi Supreme Court's holding. The text Byrom relies on pertains to the Mississippi Supreme Court's refusal to re-examine whether the exclusion of Junior's jailhouse letters denied Byrom a fair trial. *See Byrom*, 927 So. 2d at 726. No portion of that text, nor any part of the opinion more broadly, even

mentions the ineffective assistance of counsel claim asserted here. Furthermore, a review of Byrom's briefs before the Mississippi Supreme Court failed to reveal even a trace of the specific ineffective assistance of counsel claim put forth here.

By contrast, Byrom in fact presented four specific ineffective assistance of counsel claims while seeking post-conviction relief in the state court. She asserted ineffective assistance of counsel claims premised on counsel's (1) failure to pursue a change of venue; (2) general failure to investigate Byrom's case; (3) failure to adequately investigate at both the guilt and sentencing phases; and (4) failure to object to comments made by the prosecution during closing arguments. *Id.* at 715–22. Byrom did not claim, however, that counsel was ineffective in willfully violating discovery rules, causing the exclusion of Junior's letters. Byrom has attempted to shift her ineffective assistance of counsel claims to substantive areas not previously considered by the state courts. *See Smith*, 515 F.3d at 402 (finding a claim unexhausted when a federal claim is shifted to substantive areas not previously raised in state court). Therefore, this claim is procedurally barred.

In the alternative, Byrom contends that her procedural default should be excused because she has demonstrated a "manifest injustice." That is, Byrom claims that her underlying innocence excuses her default since failure to consider the claim would constitute a manifest injustice. Under the applicable precedent, Byrom must meet the "probably resulted" standard when raising a claim of actual innocence to avoid a procedural bar. *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). That is, she must "show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Id.* at 327 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). This test is more difficult to meet than a showing of prejudice. Manifest injustice "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but

rather that no reasonable juror would have found the defendant guilty." *Id.* at 329.

Apart from cursorily raising this contention, Byrom has offered no argumentation on point.  Nevertheless, it is clear that Byrom cannot meet this standard with regard to counsel's failure to produce Junior's letters and their subsequent exclusion.  As discussed above, the trial court crafted a narrow sanction in response to counsel's conduct.  That sanction still allowed counsel to question Junior regarding the letters.  The substance of the sanction did not alter the outcome of the trial.  Allowing Byrom's trial counsel to handle Junior's letters in front of the jury would not have caused all reasonable jurors to find Byrom not guilty.  Therefore, we deny Byrom's request for an expanded COA to pursue her ineffective assistance of counsel claim.

## III.   Byrom's Remaining Claims

### A.     Junior's Psychiatric Evaluation

Before Byrom's trial, the court ordered psychiatric evaluations for Byrom, Junior, and Gillis.  The same doctor, Dr. Criss Lott, conducted each evaluation, and the results were transmitted to the trial court for *in camera* review.  To date, Byrom has not seen Dr. Lott's evaluation of Junior.  However, Byrom contends that Junior confessed sole responsibility for Edward's murder to Dr. Lott.  Byrom makes this inference on the basis of information gleaned from two sources.  First, in a newspaper article about Gillis's trial, an Assistant District Attorney purportedly stated that, while preparing to try Gillis, the government learned of statements Junior made to Dr. Lott that conflicted with his anticipated testimony.  Second, Dr. Lott has apparently confirmed Junior's statement to Byrom's counsel.  Dr. Lott was even preparing to share Junior's evaluation before the trial court forbade him from doing so.  However, Byrom was aware of Junior's alleged statement to Dr. Lott before her state court appeal

and yet did not challenge the evidence's suppression. Having failed to raise these claims previously, they are procedurally barred.

Nevertheless, Byrom seeks discovery of Dr. Lott's report in order to establish three constitutional claims: (1) a *Brady* violation; (2) her actual innocence under *Schlup*; and (3) her ineligibility for the death sentence under *Sawyer*. Discovery is permitted only if good cause is found. *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000). Good cause may be found when a petition for habeas relief "establishes a prima facie claim for relief." *Id.* (quoting *Harris v. Nelson*, 394 U.S. 286, 290 (1969)). As explained below, Byrom has not met this standard.

*1.* Brady *Claim.*

"Under *Brady*, a defendant's due process rights may be violated when exculpatory or impeachment evidence, which is both favorable to the defendant and material to guilt or punishment, is concealed by the government." *Id.* In this context, "materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Rather, the defendant need only show a reasonable probability of a different result. *Id.* A *Brady* violation is established by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

Here, Byrom has not made a prima facie showing of a *Brady* violation because Dr. Lott's report does not create a reasonable probability of a different result at Byrom's trial. According to Byrom, Junior's evaluation would demonstrate that Junior took responsibility for Edward's death when interviewed by Dr. Lott. She seizes on this in order to claim that, had the report been produced before trial, it would have discredited Junior's testimony and aided Byrom's case. This may be true, but, through cross-examination

concerning the jailhouse letters, Junior's testimony was already discredited at trial and in precisely the fashion Byrom describes here. While Byrom was restricted from showing Junior's letters to the jury, her attorney questioned Junior about the letters' contents and elicited testimony that undermined Junior's testimony broadly and his statements regarding his mother's role in the murder specifically. He has already admitted to giving multiple inconsistent statements regarding who was responsible for Edward's murder. The inclusion of one additional instance of such a statement thus does not create a reasonable probability of a different outcome. Dr. Lott's report would merely bolster Byrom's initial attempt at discrediting Junior's testimony; it would not "put the whole case in such a different light as to undermine confidence in the verdict." *Id.* Since this does not amount to good cause, we deny Byrom's claim.

　　2.　　*Actual Innocence*

As discussed previously, raising an actual innocence claim requires showing "that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Schlup*, 513 U.S. at 327 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). This test "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Id.* at 329. Byrom characterizes the aforementioned *Brady* claim as the constitutional violation underpinning her actual innocence claim. However, for the same reasons discussed above, Dr. Lott's report does not establish a prima facie case of actual innocence. Byrom would have used Dr. Lott's report in precisely the way she used Junior's jailhouse letters. The effect of the report thus falls well short of the requisite standard. *See Schlup*, 513 U.S. at 327 (requiring that new evidence make it "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."). Having failed to show good cause, Byrom's claim is denied.

*3.     Eligibility for the Death Penalty*

In order to contest her eligibility for the death penalty, Byrom must show, based on the evidence proffered and all record evidence, that there is a fair probability that a rational trier of fact would have entertained a reasonable doubt as to the existence of the facts which made her eligible for the death penalty. *Sawyer v. Whitley*, 505 U.S. 333, 346–47 (1992). Here, Byrom claims that the evidence produced at trial—taken together with Dr. Lott's report—would create a fair probability that no rational juror would have found her guilty of participating in a murder-for-hire scheme, the capital crime for which she was convicted. Miss. Code Ann. § 97-3-19(2)(d).

Byrom has not, however, made the requisite showing. While Dr. Lott's report would have supported Byrom's theory of the case, in light of the other evidence produced at trial—including Byrom's own confessions—it cannot be said that a rational trier of fact would have entertained a reasonable doubt regarding the existence of a murder-for-hire scheme. According to Byrom, the parties planned to murder Edward. Junior implicated Byrom, Gillis, and himself; and Byrom separately implicated herself on more than one occasion. Even with Dr. Lott's report, it cannot be said that a rational trier of fact would harbor a reasonable doubt as to Byrom's guilt. Byrom has thus failed to show good cause, and we deny her claim accordingly.

Having disposed of Byrom's motion for an expanded COA and Byrom's motion for additional discovery, the Court will next address those issues for which the district court granted a COA.

**B.     Applicable Law and Standard of Review**

AEDPA was enacted to address perceived abuses in the habeas system, limit prisoners' ability to delay justice by filing frivolous claims, and respect state court determinations of fact and law. *See Michael Williams v. Taylor*, 529 U.S. 420, 436 (2000) (stating that AEDPA's purpose was to "further comity,

finality, and federalism," and highlighting the importance of "limit[ing] the scope of federal intrusion into state criminal adjudications and . . . safeguard[ing] the States' interest in the integrity of their criminal and collateral proceedings"); *Day v. McDonough*, 547 U.S. 198, 205–06 (2006) (AEDPA was passed to "promote[] judicial efficiency and conservation of judicial resources . . . and lend[] finality to state court judgments within a reasonable time"). AEDPA thus "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (citations and internal quotation marks omitted).

AEDPA governs our review of state court determinations of law and mixed issues of law and fact.[7] *See* 28 U.S.C. § 2254(d)(1). Section 2254(d)(1) prohibits federal courts from granting habeas relief unless the state court's denial "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id. See also Valdez v. Cockrell*, 274 F.3d 941, 946 (5th Cir. 2001) ("We review questions of law and mixed questions of law and fact under the 'contrary to' and 'unreasonable application' prong of 28 U.S.C. § 2254(d)."). The state court's decision was contrary to federal law if the "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Terry Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). The state court unreasonably applied federal law if it "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. In other words, in order to obtain habeas relief from a federal court, "a state prisoner must show that the state

---

[7] AEDPA also controls when reviewing state court findings of fact. *See* 28 U.S.C. § 2254(d)(2). No findings of fact are contested here, however.

court's ruling on the claim being presented in federal court was so lacking in justification that there was an  error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).  This standard governs our review of the state court's adjudication of Byrom's claims.

### C.    Coerced Statements

In the wake of Edward's murder, the police interviewed Byrom on five separate occasions: (1) 8:38 p.m. on June 4; (2) 10:47 p.m. on June 4; (3) 6:53 a.m. on June 5; (4) 9:00 a.m. on June 6; and (5) 3:03 p.m. on June 7.  The first four interviews took place while Byrom was still hospitalized, and Byrom implicated herself in interviews two through five.  At trial, the court excluded interviews two and three because of defective *Miranda* warnings.  It permitted the introduction of interviews four and five, however, against Byrom's objection.  Byrom now claims that the trial court erred when it admitted these two interviews because interviews two and three were the product of coercion and that coercion carried over, thus marring her subsequent statements.

The Mississippi Supreme Court dismissed this argument as moot because the trial court excluded the interviews during which coercive conduct allegedly occurred, i.e., interviews two and three.  *Byrom v. State*, 863 So. 2d 836, 861 (Miss. 2003) ("This argument is moot because the statements were excluded. . . . The remedy for coercive interrogation practices is exclusion of the statements in which the coercion was present. It does not require the exclusion of all subsequent interrogations that are preceded by proper Miranda warnings and are not coercive.").  The Supreme Court has made clear, however, that coercive tactics can indeed carry over to subsequent interviews, implicating Fifth Amendment concerns, regardless of whether earlier interviews are suppressed. *Oregon v. Elstad*, 470 U.S. 298, 309–10 (1985).  Indeed, the Supreme Court has enumerated factors for determining whether coercion taints subsequent

interrogations. *See id.* at 310 ("When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession."). As explained below, since neither AEDPA exception applies to the Mississippi Supreme Court's determination on the merits, Byrom's claim fails. *Cf. Richter*, 131 S. Ct. at 787 ("And if the state court denies the claim on the merits, the claim is barred in federal court unless one of the exceptions to § 2254(d) set out in §§ 2254(d)(1) and (2) applies.").

In order to validly waive the Fifth Amendment privilege against self-incrimination, an individual's waiver "must be voluntary in that it was not the product of intimidation, coercion, or deception." *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003). Proving that a confession was coerced requires showing that the confession "resulted from coercive police conduct and it is essential that there be a link between the coercive conduct of the police and the confession of the defendant." *Id.* at 584. Such conduct includes official overreach and direct coercion, as well as promises and inducements. *See United States v. Blake*, 2012 WL 3045649, at *1 (5th Cir. July 26, 2012) (unpublished) (per curiam). Trickery or deceit only constitutes coercion "to the extent [the defendant is deprived] of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Hopkins*, 325 F.3d at 584. "Neither mere emotionalism and confusion, nor mere trickery will alone necessarily invalidate a confession." *Self v. Collins*, 973 F.2d 1198, 1205 (5th Cir. 1992) (internal quotations marks omitted). For instance, this Court found that coercion occurred when a defendant confessed to a murder after being assured by police that the conversation was confidential. *Hopkins*, 325 F.3d at 584–85. The defendant had been isolated for fifteen days and was even interviewed by a close friend in order to help elicit a confession. *Id.* at 584. Likewise, coercion was found when a mother confessed only after police threatened to cut off her state

financial aid and take custody of her children. *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963).

Here, Byrom alleges that the police coerced the confessions she gave during interviews two and three—the two interviews that were suppressed for *Miranda* reasons—and that the coercion carried over into the subsequent two interviews during which she further implicated herself. Byrom focuses her claim on a handful of statements made to her during the course of interviews two and three, as well as the fact that she was heavily medicated while in the hospital.[8]

At the beginning of her second interview, the sheriff told Byrom that Junior had already confessed and warned Byrom against letting Junior bear the full weight of Edward's murder on his own: "He's already given us a statement on this. Don't let him be out here by himself on this." The sheriff reiterated the point later when he told Byrom that she was "trying to leave him out there by himself." The sheriff also told Byrom that she and Junior would be in danger as long as the triggerman remained free. Finally, the sheriff warned Byrom that he would tell the judge whether and to what extent Byrom cooperated: "There are [sic] stuff you are leaving out here. Now I'm going to tell you. Once we get to the point where we have to talk to the Judge and everything. All that's going to matter. He's going to ask me how did she cooperate? . . . Well I'm gonna have to tell him that you had a memory lapse on some 'stuff,' we had to pick it out of her. Now the Judge ain't going to like it." Byrom claims that these statements deceived her and exploited her emotions, thereby constituting coercion that tainted her subsequent confessions.

Having reviewed the transcripts of these interviews, it is clear that Byrom's confessions were not coerced. While the sheriff's statements were

---

[8] The doctors treating Byrom told law enforcement officers that Byrom's medications would not interfere with her ability to be interviewed. In any event, such a claim is procedurally barred for failure to adequately present it in prior proceedings.

certainly intended to cajole Byrom into confessing using her emotions and a measure of deception, they did not constitute coercion. Byrom first implicated herself after the sheriff implored Byrom to not leave Junior "hanging out there to bite the big bullet." The sheriff made that statement early during the interview, after a series of denials from Byrom. While the statement certainly suggested that Junior was facing serious legal consequences regarding Edward's murder, the police did not make any threats, promises, or other coercive statements. Insofar as the sheriff made other, subsequent statements, Byrom had already confessed and continued to do so. In any event, Byrom was not promised leniency and she was not threatened in any capacity. The sheriff merely utilized an appeal to emotion and urged her to confess to spare Junior harsher legal consequences, a permissible tactic since Byrom was not thereby deprived of knowledge essential to an understanding of her rights and the consequences of waiving them. *Hopkins*, 325 F.3d at 584.

Byrom relies on cases like *Lynumn* to claim that law enforcement threats regarding relatives, especially one's children, are particularly coercive. In *Lynumn*, the police made serious threats regarding unrelated matters, such as the defendant's access to welfare benefits and custody of her children, and they did so in a way that left the defendant with "no reason not to believe that the police had ample power to carry out their threats." 372 U.S. at 534 ("These threats were made while she was encircled in her apartment by three police officers and a twice convicted felon who had purportedly 'set her up.' There was no friend or adviser to whom she might turn."). However, no comparable conduct occurred here. The sheriff told Byrom that she and Junior were at risk as long as the triggerman remained free and stated that Junior's confession meant he was facing serious repercussions. The sheriff's statements implicated Byrom's son, but only because he was in fact a suspect. It was not incorrect to tell Byrom that admitting her role in the plot could spare Junior a harsher

punishment. Junior was not threatened with physical harm, and Byrom was not threatened by the sheriff. Byrom was in a safe setting and was not encircled by law enforcement officials. There was no official overreach or direct coercion. Since neither AEDPA exception applies, we deny Byrom's claim. *See Richter*, 131 S. Ct. at 787.

### D.    Consideration of Mitigating Evidence

Byrom also claims that the trial court erred when it failed to consider all of the mitigating evidence she presented at sentencing. Specifically, Byrom urged the court to consider (1) that she had no significant criminal history; (2) that she committed the crime under the influence of extreme mental and emotional disturbances; (3) that Edward was a participant in the crime since his abuse provoked the crime; and (4) that her ability to appreciate the criminality of her conduct or conform it to the requirements of the law was substantially impaired. At sentencing, the court made the following oral statement:

> The Court, likewise, considered the mitigating factors, specifically, that the defendant had no prior criminal record of any kind, so far as the record indicates. And, further, the Court has considered the assertion that the defendant was acting while under the influence of some extreme mental or emotional disturbance. Parenthetically, the Court would observe that these factors are the only factors suggested which would appear and bear consideration by this Court.

Byrom claims that this portion of the trial court's colloquy indicates that the court failed to consider some of Byrom's mitigating evidence, thereby undermining her death sentence. She argues that the trial court conceded its failure to fully consider Byrom's mitiating evidence when it noted that only two of her mitigating claims "bear consideration." The Mississippi Supreme Court subsequently denied Byrom's claim, finding that the trial court in fact considered all mitigating circumstances. *See Byrom v. State*, 863 So. 2d 836, 881–82 (Miss.

No. 11-70026

2003). For the reasons that follow, the Mississippi Supreme Court did not misapply clearly established federal law when it denied Byrom's claim.

In capital cases, the sentencer may not refuse to consider mitigating evidence. *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987). The exclusion of mitigating evidence can invalidate a death sentence. *Id.* at 399. "The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Eddings v. Oklahoma*, 455 U.S. 104, 114–15 (1982).

Byrom's claim fails for two reasons. First, and most importantly, the trial court did in fact consider all of Byrom's mitigating evidence. The trial court's sentencing determination was not limited to the oral statements made in court. The court also entered a formal written sentencing order. In that order, the trial court's sentencing determination was prefaced by the following language, which clearly establishes that the court considered all mitigating evidence:

> The court, *having considered each of the mitigating factors suggested by the Defendant and all other mitigating circumstances concerning the Defendant's character and history and the circumstance[s] of the offense which might be considered mitigating on behalf of the Defendant*, and having weighed the aggravating factor[s] against the mitigating factors finds that the mitigating factors do not outweigh or overcome the aggravating circumstances and that the death penalty should be imposed. (emphasis added)

As this text makes clear, the trial court considered all of Byrom's mitigating evidence and simply determined that it did not overcome the aggravating circumstances also deemed present.

Second, to the extent Byrom claims that the court's colloquy conflicts with the written sentencing order, the language cited by Byrom does not actually demonstrate that the trial court refused to consider mitigating evidence. When the trial court stated that only two of Byrom's proposed mitigating factors "bear

26

consideration," the court was not refusing to consider the other two factors. Rather, the court used the verb "bear" in the sense of "to call for" or "to have relevance." *The American Heritage Dictionary of the English Language* 161 (3d ed. 1996). As the court clarified in its written sentencing order, two of Byrom's proposed mitigating factors lacked merit. That is, the trial court evaluated all of the mitigation factors proposed by Byrom, but found two had little relevance to the final sentencing determination. In that sense, they did not "bear consideration." Fair minded jurists could not disagree. *See Richter*, 131 S. Ct. at 786. Therefore, we deny Byrom's claim.

### E.    Ineffective Counsel Regarding Mitigating Evidence

Byrom's last claim alleges that she received ineffective assistance of counsel because her trial attorneys failed to adequately investigate and present mitigating evidence at the penalty phase of the trial. In order to make an ineffective assistance of counsel claim, Byrom must show that her attorneys' performance "fell below an objective standard of reasonableness" and that the deficient performance prejudiced her case. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). The attorneys' representation must fall below an objective standard of reasonableness such that "counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Feldman v. Thaler*, 695 F.3d 372, 377–78 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 687). Byrom "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 378 (quoting *Strickland*, 466 U.S. at 689).

Further, under AEDPA, the crucial question is whether the state court unreasonably applied *Strickland*. *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011); *Williams v. Thaler*, 684 F.3d 597, 604 (5th Cir. 2012). When considering a habeas petition, our inquiry focuses on "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131

S. Ct. at 788. "[A] habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 786.

Prejudice is shown when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In the sentencing context, Byrom must establish "a reasonable probability that a competent attorney, aware of [the mitigating evidence available], would have introduced it at sentencing," and that there is a reasonable probability that the sentence would have been different as a result. *Wong v. Belmontes*, 130 S. Ct. 383, 386 (2009) (quoting *Wiggins v. Smith*, 539 U.S. 510, 535, 536 (2003)) (alteration in original). "[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1408 (2011) (alteration in original) (quoting *Strickland*, 466 U.S. at 695).

Byrom claims that she received ineffective assistance of counsel because her trial attorneys failed to adequately investigate potential mitigating evidence before sentencing and failed to present mitigating evidence at sentencing. Counsel interviewed a number of Byrom's family members, but Byrom claims counsel should have pursued further leads after uncovering evidence of persistent abuse in Byrom's childhood and adult life. Moreover, at sentencing, Byrom's trial counsel only offered psychiatric reports and medical evaluations detailing Byrom's abuse and the numerous mental and physical ailments she has suffered from. As the record makes clear, Byrom suffered a childhood of mental, physical, and sexual abuse at the hands of her stepfather, and yet more abuse at the hands of Edward. Despite the availability of at least six family

members able and willing to personally attest to the violence Byrom was subjected to, trial counsel did not present a single live witness at sentencing. Instead, trial counsel relied on psychiatric reports and medical records, supposedly because of a tactical decision to withhold witness testimony in anticipation of a new trial. Byrom has pressed these ineffective assistance of counsel claims at each stage of review. Because the Supreme Court of Mississippi issued a reasoned opinion on point, it is that decision we review in applying the standard of review provided by AEDPA. *Jackson v. Johnson*, 194 F.3d 641, 651 (5th Cir. 1999).

A divided Mississippi Supreme Court decided that Byrom had not received ineffective assistance of counsel at her sentencing. Despite finding that Byrom's trial counsel made a "perplexing" choice by not presenting live mitigating evidence, the majority opinion nevertheless held as "speculative" the proposition that testimony already known to the trial judge would have "been any more convincing or persuasive if presented through witness testimony." *Byrom v. State*, 927 So. 2d 709, 720–21 (Miss. 2006). On the other hand, the dissent struggled to find "a more egregious case of ineffective assistance of counsel during the sentencing phase of a capital case." *Id.* at 732 (Dickinson, J., dissenting). For the reasons that follow, applying § 2254(d)(1), the Mississippi Supreme Court did not unreasonably apply *Strickland* to Byrom's claim of failure to investigate or to her claim of failure to present mitigating evidence.

*1.     Investigation of mitigating evidence.*

Byrom claims that her trial counsel were aware of her extensive history as a victim of abuse, but that they entirely failed to investigate potential evidence on point. However, trial counsel clearly stated that they interviewed potential witnesses, including members of Byrom's family. In fact, counsel went so far as to make arrangements so that out-of-state family members could be in Iuka, Mississippi for Byrom's trial. Indeed, in October 2000, one of Byrom's

attorneys furnished a list of nine witnesses for trial, most of whom were family members who could confirm Byrom's history as a victim of abuse.

In support of her claim, Byrom primarily relies on the fact that her trial attorneys could not recall the specific names of which family members they interviewed in anticipation of trial. She also points to statements from family members claiming that they were not contacted by trial counsel. Nevertheless, other family members capable of providing further corroboration of abuse suffered were both interviewed by counsel and present in Iuka for the trial. Byrom has not identified what additional information would have been uncovered had her trial counsel interviewed additional family members. While those who were interviewed presented a picture of abuse, their accounts largely overlap and cover nearly identical details. Such claims thus do not demonstrate that the state court's application of *Strickland* was unreasonable or contrary to established federal law. Fairminded jurists could not disagree with the Mississippi Supreme Court's determination that Byrom's attorney conducted a reasonable investigation under *Strickland*. Accordingly, we deny Byrom's claim. *Richter*, 131 S. Ct. at 786.

2.    *Presentation of mitigating evidence.*

At sentencing, Byrom's attorneys declined to present witness testimony regarding Byrom's history of abuse, and instead opted to present two psychiatric reports detailing Byrom's claims of abuse and the various maladies diagnosed, as well as a medical evaluation detailing Byrom's many other illnesses. There are at least six family members Byrom's attorneys could have presented at sentencing, some of whom had directly witnessed the abuse Byrom suffered at the hands of both her stepfather and husband. These witnesses would have substantiated claims regarding the alcoholism of Edward and Byrom's stepfather, as well as both men's verbal, physical, and sexual abuse of Byrom. The psychiatric reports presented at sentencing nevertheless covered much of

the same information; and Byrom's history as a victim of abuse was addressed at trial as well.

Despite acknowledging that Byrom's attorneys made a "perplexing" decision in their refusal to present witness testimony at sentencing, the Mississippi Supreme Court held that the witnesses' potential testimony, of which the trial judge was already aware, would not likely have been any more persuasive if presented through live witness testimony. *Byrom v. State*, 927 So. 2d 709, 721 (Miss. 2006). The state court viewed this decision as a strategic one; Byrom's attorneys sought to reserve the family members' testimony in the event of a new trial. Further, the Mississippi Supreme Court held that Byrom's claim of prejudice was speculative at best. *Id.* As explained below, the Mississippi Supreme Court did not unreasonably apply *Strickland*.

"[E]vidence about a defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). The right to have mitigating evidence presented means little, however, if counsel fails to present a case for mitigation at sentencing. *Strickland v. Washington*, 466 U.S. 668, 706 (1984) (Brennan, J., concurring) (citing Helen Gredd, Comment, Washington v. Strickland*: Defining Effective Assistance of Counsel at Capital Sentencing*, 83 Colum. L. Rev. 1544, 1549 (1983)). That said, *Strickland* does not "require defense counsel to present mitigating evidence at sentencing in every case." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003). A petitioner challenging the adequacy of counsel's conduct must show that counsel's conduct fell below the standard guarantee by the Sixth Amendment, as well as prejudice: a reasonable probability that, but for counsel's unprofessional errors, the proceeding's result would have been different. *Id.* at 534.

No. 11-70026

Here, Byrom's counsel made the unusual decision to withhold mitigating witness testimony at sentencing in hopes of reserving said testimony for an anticipated retrial. Counsel instead elected to rely on a series of medical reports detailing Byrom's abuse and the various illnesses she suffered as a result of the abuse. However, even assuming *arguendo* that counsel's strategic decision fell below the standard required by *Strickland*, it cannot be said that Byrom was prejudiced.

In order to find prejudice here, there must exist a reasonable probability that Byrom would not have received a death sentence had counsel introduced the live testimony of Byrom's family members. The Supreme Court has instructed that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In *Wiggins*, the Supreme Court found prejudice where the petitioner's attorney had failed to investigate and present substantial mitigating evidence at the petitioner's jury sentencing. 539 U.S. at 534–36. The omitted mitigating evidence included would-be accounts of substantial abuse and neglect at the hands of the petitioner's mother and repeated instances of abuse, molestation, and rape suffered at various foster homes throughout Wiggins's childhood. *Id.* at 516–17. However, while Wiggins and Byrom each suffered substantial abuse prior to committing their respective crimes, their cases are otherwise distinguishable.

Wiggins's counsel failed to present to the sentencing jury substantial mitigating evidence that the jury had no other access to. On that basis, the Supreme Court found that at least one juror would have voted differently had the jury been presented with Wiggins's "excruciating life history." *Id.* at 537. Byrom, on the other hand, was sentenced by the same judge that conducted her trial, and the mitigating evidence at issue was substantively addressed both at trial and sentencing. In other words, to the extent the judge that sentenced Byrom was not already aware of Byrom's mitigating evidence from trial, he was

32

certainly made aware of Byrom's history of abuse by virtue of the mitigating evidence presented at sentencing. The trial judge reviewed Byrom's medical records, which included details of the abuse Byrom had suffered, before closing arguments at sentencing. The live testimony withheld by counsel would thus have added little to the judge's sentencing decision. It cannot be said that there exists a reasonable probability that the outcome of Byrom's sentencing would have been different had counsel introduced the testimony of Byrom's family members. In considering Byrom's claim, the Mississippi Supreme Court reasoned that

> [t]he gist of the family members' testimony from the affidavits was that Byrom was a good person who had lived a difficult life and that whatever she did was because she was sick and in a terrible situation. However, to argue that this testimony, which was already known to the trial judge, would have been any more convincing or persuasive if presented through witness testimony, is, at best, speculative.

*Byrom v. State*, 927 So. 2d 709, 721 (Miss. 2006). In light of the reasoning above, it cannot be said that the state court unreasonably applied *Strickland*. *See Richter*, 131 S. Ct. at 786 ("[A] habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."). Therefore, we deny Byrom's claim.

## IV.    Conclusion

For the above reasons, we DENY Byrom's motion for an expanded Certificate of Appealability, AFFIRM the judgment of the district court, and DENY Byrom's petition for habeas relief.